FORD LEASING DEVELOPMENT CO.,
Plaintiff-Respondent,

v.

CITY OF ELLISVILLE, Edward M.
O'Reilly, Robert K. Voegele, John A.
Klein, Vernon H. Jaycox, Frank Eaton,
Lyall Cunningham, Clark Compton, &
Gerad W. Wolf, Defendants-Appellants.

No. 51003.

Missouri Court of Appeals,
Eastern District,
Division Three.

Oct. 21, 1986.

Donald K. Anderson, Jr., St. Louis, for defendants-appellants.

Albert Michenfelder, St. Louis, for plaintiff-respondent.

KAROHL, Judge.

The City of Ellisville (City) denied the application of Ford Leasing Development Company (Ford Leasing) to subdivide 9.52 acres of land within the City into a 4.0 acre tract and 5.52 acre tract. City also denied Ford Leasing a conditional use permit for the four acre tract. In a Chapter 536, RSMo 1978, proceeding the trial court found the decision of the City unsupported by competent and substantial evidence. The trial court ordered the City to permit subdivision and to issue a conditional use permit subject to conditions of operation requested by the Board of Aldermen of the City and agreed to by Ford Leasing. The City appeals. We affirm.

## BACKGROUND

The land in question was formerly owned by Bud Anderson Ford Company. In December, 1977, City granted to Bud Anderson Ford Company a conditional use permit to operate a new and used automobile agency on five and one half acres of land at 1081 Manchester Road. Chapter 32 [zoning] of the City of Ellisville's Municipal Code governed such permits. In April, 1983, the Board passed Ordinance No. 1106 pursuant to Chapter 32, Section 21, granting Bud Anderson a conditional use permit to operate an AMC Jeep Dealership on the four acres. The four acres abut the five and one half acres on it's west boundary. Pursuant to this permit, Bud Anderson constructed on the four acre tract a sales agency building containing approximately 2500 square feet. Ford acquired the nine and one half acres from Bud Anderson and proposes to use the four acres in a manner similar to the use by Bud Anderson under the 1983 Ordinance. The plans approved by the City for Bud Anderson also included construction in the future of a larger service building which was never built. AMC vehicles were to be serviced by an existing Ford agency on the five and one half acres until the service building was constructed.

We now consider the application of Ford Leasing which was filed with the City in the Spring of 1984. While this application was pending Frank Bommarito Oldsmobile filed an application for a use permit to develop a sales and service building consisting of 15,000 square feet from which it intended to operate a Mazda Dealership. Frank Bommarito is located across the street from Ford Leasing. The application of Bommarito Oldsmobile was granted on June 27, 1984. After public hearings the application of Ford Leasing was denied on January 16, 1985.

## THE APPLICATION OF FORD LEASING

In January, 1984, Ford Leasing purchased from Bud Anderson the entire nine and one half acre tract. Thereafter, the eastern five and one half acres were leased to Bo Beuckman Ford. Ford Leasing closed the AMC Agency on the four acre tract and filed applications to subdivide the two tracts and for a conditional use permit for the four acres. The application requested permission to construct an additional dealership facility for the purpose of selling and servicing new and used Lincoln-Mercury automobiles. It was Ford Leasing's intention to continue to lease the five and one half acre tract to Bo Bueckman Ford Agency and to obtain from the City permission to build the Lincoln-Mercury Dealership on the remaining four acres.

Public hearings were held by the City to consider Ford's application on September 5, September 9, and October 17, 1984. The land in question is zoned Business District. Sections 32–20 and 32–21 of the City's Municipal Code describe permitted uses in a Business District. Section 32–20 provides that a new and used automobile sales agency is a permissible use in a Business District Zone only after the issuance of a conditional use permit. Section 32–21 requires an application for the permit; a recommendation [for or against] by the Planning and Zoning Commission to the Board of Aldermen and a public hearing conducted by the Board before the permit is is-

sued. "After such hearing, the Board of Aldermen shall determine whether such building use will: (1) Substantially increase traffic hazards or congestion; (2) Substantially increase fire hazards; (3) Adversely affect the character of the neighborhood; (4) Adversely affect the general welfare of the community; (5) Overtax the sewage or public utilities." Section 32–21(d). *"If the Board of Aldermen's findings be negative as to all subjects here in referred to in paragraphs (1), (2), (3), (4), and (5) of subsection (d), then the application shall be granted;* if affirmative, as to any subject, then such permit shall be denied." (emphasis ours) Section 32–21(e).

At the public hearings, Ford Leasing offered evidence to negate each of the concerns mentioned in the Ordinance which would prevent issuance of a conditional use permit. Ford presented a traffic study conducted by a traffic consulting firm which indicated there would be little difference between traffic produced by the former use of the four acres, AMC Jeep Sales Agency, and the proposed Lincoln-Mercury operations. The study demonstrated that traffic generated by the new Lincoln-Mercury dealership would be considerably less during peak hours than if the property was used as an office or retail business, but it would generate more traffic on Saturdays.

The Building Commissioner of the City responded and offered his own interpretation of the study. By his own admission he was not qualified as an expert. Traffic hazard in this context is not a matter readily apparent to a layman. He concluded that the Lincoln-Mercury agency would increase traffic by two percent. Ford Leasing's consulting firm indicated that the Building Commissioner did not take into account the fact that the traffic would be going in both directions and therefore the two percent increase in traffic should be divided in half and the traffic would effectively increase by only one percent. There was no evidence to refute this testimony. Additionally, no evidence was presented that a one percent or even a two percent increase in traffic would cause an increase in *traffic hazard or congestion.*

The Ballwin Fire District approved the Plan presented by Ford Leasing and concluded that there would not be a substantial increase in any fire hazard.

On the issue of whether the proposal would "adversely affect the character of the neighborhood" Ford Leasing presented a study performed by a real estate appraiser. The appraiser stated that his study included twenty-eight automobile agency sites, fifteen fast-food sites and eight service stations to determine the proposal's effect on the value of adjacent residential property. He concluded there was no indication the value of residential homes closest to the Ford property would vary in value from the homes a greater distance away in neighboring subdivisions. He noted in his study that while there are many people who might not wish to voluntarily live near any type of commercial facilities, there are just as many others of opposite views in the market place. Because the market place is very large and includes so many diverse types of people there is little discrimination between sites and therefore the market value is not affected. The appraiser concluded that there would be no adverse effects on the neighborhood. When asked by a Board member whether his study addresses the present situation where a dealership is withdrawn and an additional dealership is substituted in it's place, he responded, "no".

The only evidence presented at the hearings regarding the effects on the character of the neighborhood were made by three owners of abutting or nearby property along the north line [rear] of the proposed agency. The three owners expressed their concern about noise from the dealership's loud speakers and tools as well as the upkeep and maintenance of the buffer zone between the commercial and residential properties. None of the owners stated specifically that it would diminish the value of their property. However, one owner stated he would assume the proposed agency may have an adverse effect on the value on his property but offered no substantial evi-

dence to support the same. No comparison was made between the previous use by AMC Jeep sales and the proposed use by Ford Leasing on this account.

In regard to the proposal's effect on the general welfare of the community, the Mayor of the City stated, "I feel six dealers in a town of 6,000 people is adequate." The City requested Ford Leasing to submit an Environmental Impact Report which was performed by a professional engineer. The report analyzed the potential environmental effect of the proposed dealership and concluded that the dealership could produce adverse effects on the environment, but that these effects were outweighed by "progress". The Board chose to accept only part of the report regarding the adverse effects and rejected the "progress" portion of the report based on the fact that one dealership existed for every 1,000 persons within the City. The Environmental Impact Report was not discussed during the public hearings and was submitted to the Board after the third and final public hearing.

Structural Systems Inc. submitted a report stating, "[a]ll utilities including sanitary sewage are available and adequate for the tract." The only evidence in opposition on this subject was the testimony of a Lieutenant of Police for the City. He stated that, "if one more large automobile dealership goes into the city, we will probably be asking the Board for extra man-power." Calculations were made and offered regarding the costs of an extra police officer versus the amount of money derived from a new dealership. It was determined that the costs associated with another dealership would exceed revenues by $25,000.00 if the City approved the conditional use permit based on the assumption that the City would have to employ an additional police officer.

On January 16, 1985, the Board of Aldermen denied the conditional use permit. On February 10, 1985, the Board submitted findings of fact and conclusions of law. Thereafter, Ford petitioned in the Circuit Court for a Chapter 536 Administrative Review and Mandamus.

The trial court determined the City's denial of the permit was "unsupported by competent and substantial evidence upon the whole record and was an abuse of discretion." The court ordered Ford Leasing to provide for the discharge of storm water; to provide a twenty-five foot landscape buffer zone along the north line of the property; to backshield all outdoor lighting; and to eliminate any outside loud speakers that may be installed. The court also ordered the City and Mayor and the Board of Aldermen to approve the preliminary plat and final plat of the subdivision as submitted by Ford. The City appeals.

■ "When the legislative body of the city chooses, ... to delegate to itself the discretionary power to enforce its regulation of conditional use permits, it acts administratively in passing on applications for such permits." *State ex rel. Steak n Shake, Inc. v. City of Richmond Heights*, 560 S.W.2d 373, 376 (Mo.App.1977). "On appeal to the circuit court [where] the decision of the City Counsel was reversed and the Counsel directed to issue the permits ... [o]ur scope of review is equivalent to that of the circuit court. We review the decision of the City ..., not the judgment of the Circuit Court." *Sandbothe v. City of Olivette*, 599 S.W.2d 38, 39 (Mo.App. 1980). *See also, Fleming Foods of Missouri, Inc. v. Runyan*, 634 S.W.2d 183, 184 (Mo. banc 1982). We may not substitute our judgment for that of the Board; we review the evidence in the light most favorable to its decision to determine whether such decision is supported by substantial and competent evidence. *State ex rel. C.C.G. Management Corp. v. City of Overland*, 624 S.W.2d 50, 54 (Mo.App.1981).

City's first "point" merely recognizes the proper standard of review. It is not in itself a claim of error. Our inquiry may extend to the determination of whether the action of the agency is unsupported by competent and substantial evidence upon the whole record; is arbitrary, capricious

or unreasonable; and it involves an abuse of discretion. § 536.140(2), RSMo (1978).

City's first claim of error is "[t]he trial court erred as appellants' decision to deny respondent's application for a conditional use permit was supported by substantial and competent evidence on the record as a whole and was not the result of arbitrary or capricious action or an abuse of discretion."

Before considering this point, we believe it is useful to consider whether the conditional use permit issued in 1983 to the prior owner, Bud Anderson Ford Company d/b/a/ AMC Jeep Agency, runs with the land. If so the claim of error is insignificant. This question occurs because of a letter dated October 11, 1983, to Bud Anderson from the City's Building Commissioner, in which he stated: "I also point out the [1983] Ordinance recently passed which allows conditional use permits to go with the land rather than with the operator as in the past. In other words, the use permit is transferable." The City Ordinance granting the conditional use permit to Bud Anderson does not mention transferability. The reference is apparently an expression of opinion of the Building Commissioner. No separate ordinance has been offered which expressly grants transferability of city use permits.

■ "A 'special permit' or 'special exception' designates a species of administrative permission which allows a property owner to put his property to a use which the regulations expressly permit under conditions specified in the zoning regulations themselves. Some zoning laws or ordinances use the term conditional use permit, ... to refer to this type of administrative permission." 82 Am.Jur.2d *Zoning and Planning* § 281 at p. 827 (1976). The grant of a special permit is regarded as personal to the landowner to whom it is granted. Whereby a variance which "runs with the land" is distinguished from a mere "permit" which is personal to the guarantee. *Balodis v. Fallwood Park Homes, Inc.,* 54 Misc.2d 936, 283 N.Y.S.2d 497, 501

(1967). (emphasis ours) *See also,* 82 Am. Jur.2d §§ 255–257.

> The mere issuance of a zoning or building permit gives no vested rights to the permittee, nor does he acquire a property right in the permit.... Under or apart from statute, however, a permittee acquires a property or vested right where he has acted on the faith of a zoning or building permit or certificate....

101A C.J.S. *Zoning and Land Planning* § 222 (1979)

> It has been said a building represents an investment in the improvement of the land upon which it is erected; and if regard were not had for the reasonable protection of such investment, then a zoning law, order, resolution or ordinance would frequently be confiscatory with respect to its application to particular structures. Not only is a building erected with a view to its adaptation to a specific form of use which is to be made of it, but it is often difficult, if not impossible, to convert it to an entirely different form of use.

*Brown v. Gambrel,* 358 Mo. 192, 213 S.W.2d 931, 935 (1948).

■ In the present case Bud Anderson was granted a conditional use permit for an AMC Jeep Dealership. It presented it's construction plans to the Board which included the proposed erection of a sales building with future plans for a service building addition. Bud Anderson constructed the sales building but never built the service building. Therefore, it's rights vested only in the continued operation of the sales building and only this runs with the land and consequently to the Ford Leasing. Because the service building was never built the conditional use permit for this expansion remained personal to Bud Anderson. Therefore, the conditional use permit pertaining to the service building expansion does not run with the land and did not transfer to Ford Leasing.

■ The fact that the City authorized a sales and service facility to Bud Anderson for an AMC Jeep operation may, however, constitute evidence supporting Ford Leas-

ing's claim that the City acted arbitrarily and capriciously in denying its application for a conditional use permit. If the decision of the City in favor of Bud Anderson but against Ford Leasing cannot be justified by fact differences in regard to the five tests of the Ordinance there is support for finding denial was arbitrary. The specific size of Bud Anderson's intended service building for AMC Jeep is not given in the record. This building was not constructed. However, the record is clear as to Ford's intention to use the existing sales building of 2,507 square feet; to build a service facility of an additional 12,500 square feet and to build a used car facility of about 750 square feet. Ford's application was similar although, not the same as that of the previous owner. We may assume that the City found no negative results under subsections 31–21(d) and 32–21(e) in considering the Bud Anderson use application because it was approved in 1983.

■ The City is not authorized to pick and choose between similarly situated applicants. *Wolfner v. Board of Adjustment of the City of Frontenac*, 672 S.W.2d 147, 151 (Mo.App.1984). For this reason it is significant that Bommarito Oldsmobile filed an application for a conditional use permit for property across the street from the subject property after the application of Ford Leasing was filed. The application of Frank Bommarito was approved summarily and before the application of Ford Leasing was denied. City contends that the permit for Frank Bommarito Oldsmobile may be distinguished from the application of Ford Leasing because the Frank Bommarito application involved the expansion of an existing agency but not the creation of a new agency. This distinction does not appear to be relevant to any of the five tests set forth in Section 32–21(d). The permit for Frank Bommarito authorized the construction of a new and large service building containing 15,000 square feet; a new Mazda Dealership would occupy and use the new building.

■ The fact that the Mazda Dealership was operated by the same interests who operated the Bommarito Oldsmobile agency would not prevent an increase in traffic hazards, an increase in fire hazards, an adverse affect on the neighborhood, an adverse affect on general welfare, or, an increase in use of sewage and public utilities. Because the application of Ford Leasing was first filed, the merits of that application should be tested by the conditions at the time of filing and not at the time of denial which occurred after the application of Frank Bommarito Oldsmobile had been approved. To do otherwise, would be to permit the City to prefer the latter application over the former. We do not find any evidence in the record to support a distinction between the two applicants under the tests provided in the Ordinance. Ford Leasing requested permission to build a building substantially the same size as that approved for Frank Bommarito Oldsmobile-Mazda. Both were intended to sell a different brand of automobile than was already available from existing dealerships. Presumably the different brand of automobile would attract additional sales and service customers in either case.

The Board of Aldermen in it's administrative capacity (as distinguished from legislative) denied the conditional use permit and submitted findings of fact and conclusions of law. They found that such a permit would: (1) substantially increase traffic hazards or congestions; (2) would adversely affect the character of the neighborhood; (3) would adversely affect the general welfare of the community; and (4) would overtax public utilities.

■ We find the City's denial of the permit was unsupported by competent and substantial evidence upon the whole record and was an abuse of discretion. " 'Substantial evidence' is defined as competent evidence which, if believed, would have probative force upon the issues." *Citizens For Rural Preservation, Inc. v. Robinett*, 648 S.W.2d 117, 124 (Mo.App.1982). First, the City did not receive any substantial evidence that might suggest the proposed

use would substantially increase traffic *hazards* or *congestion.* A traffic study presented by Ford Leasing to the Board suggested a slight increase in traffic at "off peak" times. The City's Building Commissioner, not an expert by his own admission, stated only that the traffic would increase by two percent. Ford rebutted that the traffic would be divided by the flow in two directions. There was no evidence from which the Board could find that the one percent or even a two percent increase in traffic would increase *hazards* or *congestion.* "The test established by the ordinance is whether there would be a 'substantial increase in traffic hazards or [traffic] congestion; not whether there would be some increase in the volume of traffic. The record is totally devoid of any evidence of the former.'" *State ex rel. Steak n Shake, Inc. v. City of Richmond Heights,* 560 S.W.2d at 377. Further, the intervening approval of the subsequent application of Oldsmobile-Mazda suggests that denial of the present applications would treat applicants differently without a basis for distinction. This the City may not do. *Wolfner,* 672 S.W.2d at 151.

Second, no evidence was presented to support the Board's findings of the adverse effect on the neighborhood or the general welfare of the community. A real estate appraiser retained by Ford Leasing studied the neighborhood and found that the Lincoln-Mercury dealership would have no negative effect on the values of the residential homes. An economic impact study found that the advantage of "progress" outweighed any negative impacts on the environment.

The findings of the City was apparently based on the view expressed by the Mayor that six dealerships in a town of 6,000 people is adequate. Whether or not this is true, the Board overlooked this fact when it approved a second dealership for both the Bud Anderson Ford and AMC Jeep dealerships before the application and the Frank Bommarito Oldsmobile-Mazda dealerships *after* the application. The fact that one owner operated two dealerships on a tract of land or that two dealerships operated independent of one another would be irrelevant when applying the five tests enumerated in Subsection 31–21(d) of the City's Code. Significantly, there was no evidence to support such distinction.

Third, the Board found as a fact that the proposed dealership would overtax the public utilities of the city. The finding is without support. Ford proposes to increase the storm water detention structure seven times its' present capacity. A report from Structural Systems Inc., was submitted stating that all utilities including the sanitary sewage were available and adequate for the tract. City contends in it's brief that a public utility includes police protection. We disagree. "A 'public utility' is a business or service which is engaged in regularly supplying the public with some commodity or service of public consequence, such as electricity, gas, water, transportation, or telephone or telegraph service." 64 Am.Jur.2d *Public Utilities* § 1 at p. 549 (1976). The City relies on this definition. It cites no legal authority to support a conclusion that Section 32–21(d)(5) was intended to refer to it's Police Department as a public utility or that such department has ever been so described. Further research in this area has failed to establish one reference to police protection as a public utility. The fact that police protection is a service does not make a police department a public utility. A police department is not separately funded or regulated. The Board itself renders a service to the public but it is not a public utility.

We affirm the judgment of the trial court.

PUDLOWSKI, P.J., and CRANDALL, J., concur.