CITIZENS FOR SAFE WASTE MANAGEMENT, Mary Stellhorn, and Mark Heil, Plaintiffs/Appellants,

v.

ST. LOUIS COUNTY, et al.,

and

Halls Ferry Investments, Inc. Defendants/Respondents.

No. 58379.

Missouri Court of Appeals, Eastern District, Division Two.

May 14, 1991.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 12, 1991.

Application to Transfer Denied July 23, 1991.

Lewis C. Green and Bruce A. Morrison, Green, Hennings &·Henry, St. Louis, for plaintiffs/appellants.

Gerald A. Rimmel, Michael Waxenberg, St. Louis, John Ross and James White, Clayton, for defendants/respondents.

AHRENS, Judge.

Plaintiffs appeal from the judgment of the trial court affirming the St. Louis County Planning Commission's approval of a Final Development Plan for a sanitary landfill in North St. Louis County. We dismiss the appeal of corporate plaintiff Citizens for Safe Waste Management and in all other respects affirm the judgment of the trial court.

## I. Background

On April 15, 1982, a Petition to the St. Louis County Planning Commission for a Conditional Use Permit (CUP) was filed by "New Halls Ferry Land Fill" as developer and lessee of the property named in the Petition as the site of the proposed landfill. "New Halls Ferry Land Fill" was, at the time of the Petition for CUP, a joint venture of R.W. Meyer and Donald R. Zykan, acting in their capacity as presidents of their respective corporations, Riverview Stone and Material Company and Zykan Brothers, Inc.

The Planning Commission on September 14, 1982, recommended that the Council approve the Petition for the CUP. On March 3, 1983, the St. Louis County Council by Resolution No. 3187 approved the CUP after a public hearing on December 9, 1982. A citizens' group appealed the Council's decision to the Circuit Court; the Missouri Supreme Court on a writ of prohibition held that the Circuit Court lacked jurisdiction over the appeal because it was not timely filed. *State ex rel. McNary v. Hais*, 670 S.W.2d 494 (Mo. banc 1984).

On February 29, 1984, the individuals and corporations who were granted the CUP under the name "New Halls Ferry Land Fill" assigned their interests related to the landfill site to "Halls Ferry Investments, Inc.," which had been incorporated on April 25, 1983. On February 11, 1986, Halls Ferry Investments, Inc., as the developer of the landfill, submitted its Final Development Plan (FDP) to the St. Louis County Department of Planning. On October 27, 1986, the Planning Commission approved the FDP, as modified, after consideration by the Department of Community Health and Medical Care, the Department of Public Works, the Department of Parks and Recreation, and the Department of Highways and Traffic.

Plaintiffs sought a declaratory judgment in Circuit Court to invalidate the Planning Commission's approval of the FDP and sought injunctive relief to prevent St. Louis County from implementing the FDP or from issuing an operating permit. From a judgment denying relief to plaintiffs and affirming the Planning Commission's approval of the FDP, plaintiffs appeal, arguing that the trial court erred in affirming the Planning Commission's approval because the FDP failed to meet the minimum requirements established in the conditions governing the CUP.

## II. Jurisdiction

■ Although not raised by the parties at trial or on appeal, we must as a preliminary matter address the issue of failure to exhaust administrative remedies. The issue is one of jurisdiction to be addressed by courts sua sponte, if necessary. *American Hog Co. v. County of Clinton,* 495 S.W.2d 123, 125 (Mo.App.1973).

■ The Board of Adjustment was not required to hear plaintiffs' appeal under § 64.120.1, RSMo 1986. That section declares a county board of adjustment's powers and duties:

(1) To hear and decide appeals where it is alleged there is error of law in any order, requirement, decisions, or determination made by an administrative official in the enforcement of the county zoning regulations;

(2) To hear and decide all matters referred to it or upon which it is required to pass under county zoning regulations;

(3) In passing upon appeals, where there are practical difficulties or unnecessary hardship in the way of carrying out the strict letter of such order, which difficulties or hardship constitute an unreasonable deprivation of use as distinguished from merely granting a privilege, the board may vary or modify the application of any of the regulations or provisions so the intended purpose of the regulation shall be strictly observed, public safety and welfare secured and substantial justice done.

Subsection (1) does not apply because in the present case the decision was made not by an "administrative official," but by the Planning Commission.

Second, no evidence in the record[1] requires the Board of Zoning Adjustment to hear appeals of the Planning Commission's decision to approve the Final Development Plan, and the County Council did not refer the matter to the Board. Therefore, subsection (2) does not apply.

Finally, this case does not fall within the "hardship" variance provision of subsection (3), so the Board was not required to hear the appeal on that ground.

Because we find nothing within § 64.120 or the record to require the Board of Zoning Adjustment to hear the appeal now before us, we find no jurisdictional barrier to the trial court's or this court's consideration of this case based upon plaintiffs' failure to exhaust administrative remedies.

## III. Standing

Plaintiff Citizens for Safe Waste Management is a not-for-profit corporation organized to promote and study environmentally safe methods of waste manage-

---

**1.** The County ordinance corresponding to § 64.120 RSMo is not a part of the record on appeal, and we may not take judicial notice of it. *Browning—Ferris Indus. of Kansas City v. Dance,* 671 S.W.2d 801, 807 (Mo.App.1984).

ment, lessen dependence upon landfills for waste disposal, and educate the public concerning safe waste management. A number of the organization's members are owners or residents of property in close proximity to the landfill site at issue in this case, including plaintiff Mary Stellhorn, who jointly owns property adjacent to the site. Plaintiff Mark Heil rents property located within a mile of the site. The individual plaintiffs allege that they are adversely affected by the dust, noise, fumes and offensive odors, and increased traffic generated by the landfill operation. The corporate plaintiff makes these same allegations with respect to those of its members who live near the landfill site.

■ We note that whether the party opposing the administrative decision has standing is an ad hoc determination to be made by the courts under the particular facts of the case. *Stickelber v. Board of Zoning Adjustment*, 442 S.W.2d 134, 136 (Mo.App.1969). On the record before us, we find the allegations sufficient to confer standing on the individual plaintiffs but insufficient as to the corporate plaintiff.

■ In order to gain standing to challenge an administrative zoning decision, plaintiffs must demonstrate a specific and legally cognizable interest in the subject matter of the decision and show that the decision will have a direct and substantial impact on plaintiffs' personal or property rights or interests. *State ex rel. Crouse v. Savannah*, 696 S.W.2d 346, 348 (Mo.App. 1985) (*citing City of Eureka v. Litz*, 658 S.W.2d 519, 522 (Mo.App.1983)). Plaintiff Citizens for Safe Waste Management is a legal entity distinct from the persons who comprise its membership. As such, the corporation in order to gain standing must itself demonstrate a legally cognizable interest separate and apart from the interests of its members. *Citizens Against Rezoning v. St. Louis County*, 563 S.W.2d 172, 173 (Mo.App.1978) (*citing Lindenwood Improvement Assoc. v. Lawrence*, 278 S.W.2d 30, 31 (Mo.App.1955)).

■ Plaintiff corporation alleges no interest in the subject matter of the Planning Commission's decision other than the interests of its individual members. Its vague allegation of "irreparable injury" demonstrates no specific and direct effect on any interest sufficient to confer standing. We decline to apply in zoning cases the liberalized federal rule of organizational standing. *See Citizens for Rural Preservation v. Robinett*, 648 S.W.2d 117, 133 n. 14 (Mo.App.1982). Claims of environmental damage are by their nature capable of being made by a great number of parties; it is therefore important to limit the entitlement to judicial review to those parties capable of demonstrating a direct, specific, legally cognizable interest distinct from the interests of the general public. To permit each member of the public who disagrees with a zoning decision to seek judicial review would effectively destroy the administrative zoning structure. *Palmer v. St. Louis County*, 591 S.W.2d 39, 41 (Mo.App. 1980). Plaintiff corporation has failed to demonstrate the requisite interest on the record before us.

■ As noted earlier, plaintiffs' petition alleges that plaintiff Mary Stellhorn jointly owns and resides on property adjacent to the landfill site and that she will be adversely affected by the fumes and odors, increased traffic, dust, and noise generated by the landfill operation. She also alleges that the operation will depreciate the value of her property.

■ An adjoining, confronting or nearby property owner has standing, without further proof of special damage, to assert the right for review of an administrative decision affecting the property in question. *Allen v. Coffel*, 488 S.W.2d 671, 675 (Mo. App.1972). The proximity of plaintiff's property to the site in question is sufficient to bestow standing. *See Palmer*, 591 S.W.2d at 41–42; *State ex rel. Housing Auth. of St. Louis County v. Wind*, 337 S.W.2d 554, 558 (Mo.App.1960).

■ Under the case authorities cited, plaintiff Mary Stellhorn has alleged sufficient facts to gain standing to challenge the Planning Commission's decision. Defendants challenge her standing by arguing that plaintiff, as a single owner of

property assumed to be held in a tenancy by the entirety, may not alone challenge a zoning decision affecting the property. We disagree. Defendants cite only *Marks v. Bettendorf's,* 337 S.W.2d 585 (Mo.App. 1960), as authority for their proposition. That case held only that, under § 89.060, tracts held by the entirety where only one owner signed should not have been counted in arriving at the amount of footage represented by owners seeking to protest a zoning change. *Id.* at 595. The case does not strip standing from a joint owner who has demonstrated that he is aggrieved by a zoning decision affecting his property.

We recognize that a tenancy by the entirety represents a unity of ownership and rights that is not to be affected by one owner acting in his own behalf. However, we find a distinction between a situation in which an owner attempts to burden the property and one in which an owner seeks to protect the entire estate from injury or loss, to the benefit of the other owner. In the present case, plaintiff seeks to challenge a zoning decision that allegedly harms the property, and defendants point to no evidence indicating that the plaintiff's husband opposes her action. We find *Marks* inapposite. The allegations as to plaintiff Mary Stellhorn are sufficient to confer standing.

■ Plaintiffs allege in their petition that plaintiff Mark Heil is a tenant residing approximately ¾ mile from the landfill site at issue. They further allege that he will be adversely affected by the fumes, odors, dust, noise, and increased traffic resulting from the operation. Again, we find these allegations sufficient under the authorities previously cited to demonstrate the interest in the administrative decision and impact upon personal or property rights necessary for standing to challenge the decision.

Defendants argue that plaintiff Heil, because he does not own the property on which he resides, lacks the requisite interest. We find no authority for the proposition that a plaintiff must *own* property near the site at issue in order to have personal or property rights or interests directly and substantially impacted. Defendants direct us to *Stickelber* and *Hasekamp v. Superior Equip. Co.,* 490 S.W.2d 385 (Mo.App.1973). While certain language in those cases may appear to require ownership, the courts based their decisions upon plaintiffs' failure to allege *any* property interest or showing of aggrievement by any other criterion.[2] In this regard, we note the case of *Schmitt v. City of Hazelwood,* 487 S.W.2d 882 (Mo.App.1972), wherein a lessee operator of a gasoline station and car wash sought injunctive relief and a declaratory judgment that the City had illegally issued a special use permit to defendant. The Court found the plaintiff failed to demonstrate the requisite "legally protectible interest" because he alleged insufficient facts to show the "irreparable damage" to his leasehold interest he claimed to have suffered. *Id.* at 888–89. Notably, the court did not find that a tenant as a matter of law could not have the requisite personal or property interest, but only that the tenant in that case had failed to show sufficient adverse effect to his leasehold interest. *Id.* In appropriate circumstances, we see no reason why a tenant may not have the same standing as an owner to challenge a zoning decision that directly and substantially impacts his property interests. A change in contiguous or closely proximate property may as readily affect the value and enjoyment of a leasehold interest as it does an ownership interest. Accordingly, we find the allegations as to plaintiff Mark Heil sufficient to confer standing.

### IV. Judicial Review

■ Rule 100.01 provides that "[t]he provisions of sections 536.100 through 536.150, RSMo, shall govern procedure in circuit courts for judicial review of actions of administrative agencies unless the statute governing a particular agency contains dif-

---

**2.** The same analysis applies to *Citizens Against Rezoning* and *Lindenwood,* cited by defendants with respect to the corporate plaintiff's standing. We disagree with the characterization of these cases in *Robinett,* 648 S.W.2d 117 n. 14. Plaintiffs are required only to demonstrate a legally cognizable interest, which need not necessarily amount to an ownership interest.

ferent provisions for such review." The parties have treated this case as one governed by § 536.150, which provides for judicial review by injunction or original writ when there is no other provision for judicial review. We note that Section 64.120.3, RSMo, provides for judicial review of the decisions of a board of adjustment, county commission, or of any officer, department, board, or bureau of the county. This section appears to constitute an "other" or "different" provision for judicial review contemplated by Rule 100.01 and § 536.150. Although cases should be filed pursuant to their special statutes, many zoning cases involving the administrative review of decisions regarding conditional and special use permits or building permits have been reviewed pursuant to Chapter 536, RSMo. *Lorenz v. City of Florissant*, 747 S.W.2d 222, 224 (Mo.App.1988) (citations omitted). Accordingly, review under Chapter 536 is appropriate in this case.

Review under Chapter 536 may be by petition under § 536.100 or by injunction or original writ under § 536.150. The determining factor is whether the Planning Commission's decision was made in a contested case. A "contested" case is defined as a proceeding before an agency in which legal rights, duties or privileges of specific parties are required by law to be determined after a hearing. Section 536.010(2), RSMo 1986. A "noncontested case" means an agency decision rendered without hearing and not subject to administrative review that determines the "legal rights, duties, or privileges of any person." Section 536.150, RSMo 1986; *State ex rel. State Tax Comm'n v. Walsh*, 315 S.W.2d 830, 834[1] (Mo. banc 1958). The present case is not contested; the St. Louis County ordinance provides for a hearing only on the Petition for the original CUP, not on the Planning Commission's approval of the FDP. St. Louis County, Mo., Rev.Ordinances § 1003.181.8(2) (1988).

 A judgment entered in a noncontested case under § 536.150 is essentially the same as other judgments declared in court-tried cases. *Phipps v. School Dist. of Kansas City*, 645 S.W.2d 91, 97 (Mo. App.1982). Accordingly, our review is defined by Rule 73.01, as construed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). The appellate court is to sustain the decree or judgment of the trial court "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. Appellate courts should exercise the power to set aside a decree or judgment on the ground that it is 'against the weight of the evidence' with caution and with a firm belief that the decree or judgment is wrong." *Id.* at 32. Further, the court of appeals owes deference to the trial court's assessment of the witnesses and their credibility, and reviews the judgment of the circuit court, not the agency's decision. *Phipps*, 645 S.W.2d at 96. Finally, the parties here did not request, nor did the trial court make, findings on controversial fact issues pursuant to Rule 73.01(a)(2). We therefore assume that all fact issues were found in accordance with the result reached, *City of Ladue v. Horn*, 720 S.W.2d 745, 748 (Mo.App.1986); Rule 73.-01(a)(2), and we must affirm if the trial court's judgment is sustainable on any reasonable theory. *Worlledge v. City of Greenwood*, 627 S.W.2d 328, 331 (Mo.App. 1982).

## V. Transferability of the CUP

 As a preliminary issue, we must determine the effect, if any, of the change in developers that occurred after the issuance of the CUP and before the approval of the FDP. As noted earlier, the grantees of the CUP assigned their interests related to the landfill site to the present developer and Intervenor–Defendant, Halls Ferry Investments, Inc., approximately one year after the issuance of the CUP. Roughly two years later, Halls Ferry Investments submitted its FDP to the Department of Planning, which was approved, as modified, eight months later. Plaintiffs contend that the transfer of interests terminated the CUP, so that the Intervenor–Defendant operated without authority in proceeding to prepare its FDP for submission to the Department of Planning.

In rejecting Plaintiffs' argument, we need turn only to the terms of the St. Louis County Ordinance and the CUP itself. The Resolution granting the CUP states as a "Standard Development Condition":

> Any transfer of ownership or lease of property shall include in the transfer or lease agreement a provision that the purchaser or lessee agrees to be bound by the conditions herein set forth and included in the approved development plan for the property. A copy of the above conditions shall be furnished by the owner or petitioner to the operator(s), owner(s), or manager(s), *including successive operator(s), owner(s), or manager(s)*, who shall forward to the Zoning Enforcement Officer an acknowledgement that he or she has read and understood each of these conditions and agrees to comply therewith [3]. (emphasis added).

St. Louis, Mo., County Council Res. 3187 (March 3, 1983). Further, the St. Louis County Revised Ordinance specifically contemplates the transfer of CUPs, providing that:

> In each instance in which approval of use or development of property is made subject to conditions by the County Council or Planning Commission in the approval of a Conditional Use Permit, Special Procedure, Mixed Use Development, or Planned Industrial or Commercial Development, a copy of the approved ordinance, resolution, order or permit shall be furnished by the property owner or owners or petitioner to the operator, owner, and manager, *including successor operators, owners, and managers.* Each successor shall forward to the Zoning Enforcement Officer an acknowledgement that he or she has read and understood each of the conditions relating to the use and development of the property affected by the ordinance, resolution, order or permit and agrees to comply therewith.[4] (emphasis added).

St. Louis County, Mo., Rev.Ordinances § 1003.167.13 (1988).

In support of their argument for non-transferability plaintiffs point to a different section of the CUP, which states:

> ... prior to issuance of any operation permit for the sanitary landfill, the *petitioner* shall submit a Final Development Plan to the Planning Commission for review and approval. (emphasis added).

St. Louis, Mo., County Council Res. 3187 (March 3, 1983). Although the provision states that the "petitioner" shall submit the FDP, its focus is on the submission of the FDP rather than on any requirement that it be the petitioner and no other who fulfills the FDP requirement. The question of transferability is specifically addressed in a separate provision of the CUP, and the document must be taken as a whole in any interpretation of its terms. Plaintiffs' attempt to distinguish the transferability provisions by arguing that the provisions contemplate transfers only after construction. This argument is without merit, however, as there is nothing within the provisions that so restrict the contemplated transfers.

Plaintiffs further point to this court's decision in *Ford Leasing Dev. Co. v. City of Ellisville,* 718 S.W.2d 228 (Mo.App. 1986), as support for their argument that a CUP is personal to the grantee, and therefore nontransferable, until the time of construction. However, in holding that a specific CUP for a building expansion that was never built was personal to the grantee and

---

**3.** Nothing in the record demonstrates the developer's compliance with the requirement that the successor forward to the Zoning Enforcement Officer an acknowledgement as described. Because the issue was not raised on appeal, we decline to consider it. We note, however, without deciding, that we consider the issue one of enforcement properly the subject of the County's continuing supervision of the landfill. We also note that the Zoning Enforcement Officer never listed any failure to file an acknowledgement as a deficiency in the FDP's conformity with the CUP, and that the developer is required to annually file a certified statement of compliance with all conditions.

**4.** *See* note 3. We further note that the County's Land Use Supervisor construes the County Zoning Ordinance to permit the transfer of CUPs and other special procedures, and the interpretation of a zoning ordinance by the body in charge of its application is entitled to great weight. *Coots v. J.A. Tobin Constr. Co.,* 634 S.W.2d 249, 252 (Mo.App.1982).

not transferable, *Ford* expressly noted that the City Ordinance granting the CUP did not mention transferability, and that no separate ordinance had been offered which expressly granted transferability of city use permits. *Id.* at 232. Therefore, *Ford* is distinguishable on its facts, and does not hold that *all* CUPs are nontransferable.

Plaintiffs' final points in support of their argument for transferability may be addressed summarily. First, plaintiffs reference §§ 260.205.13 and 260.215.2, RSMo 1986 (Supp.1990), the *state* law that expressly prohibits the transfer of solid waste permits and authorizes a city or county to adopt its own substantially consistent ordinances concerning solid waste management. Plaintiffs' attempted analogy fails; it is the St. Louis County ordinance which governs this case, and both that ordinance and the CUP itself expressly contemplate transferability. Nothing in the sections plaintiffs cite prohibit St. Louis County from permitting the transfer of CUPs.

Finally, plaintiffs note the concern the Council expressed, when it considered the Petition for CUP, regarding the qualifications of the landfill operators, gleaning from this concern that the Council sought to make the CUP personal to the grantee. Plaintiffs' argument fails to note, however, that the same Council authorized the CUP containing the express transferability provision. Further, the Council in the CUP expressly designated the Zoning Enforcement Officer of the County as the individual charged with enforcing the conditions of the permit in accordance with the FDP approved by the Department of Planning. Should the developer fail to properly operate the landfill, the problem is one of enforcement and not an issue presently before this court. Accordingly, the CUP was properly transferred to the present developer, Intervenor–Defendant Halls Ferry Investments, Inc.

## VI. Approval of the FDP

Both parties agree that the broad issue before this court is whether the Planning Commission exceeded its authority in approving the FDP as conforming to the CUP. Plaintiffs may not now challenge the issuance of the CUP itself. Similarly, issues regarding the grant to defendant Halls Ferry Investments of its Permit for Operation and License to Operate are not now before this court.

The standard for the FDP's conformity with the CUP is set forth in the St. Louis County Revised Ordinance, which provides in relevant part that:

> Subsequent to the effective date of the Conditional Use Permit, a site development plan[5] shall be submitted for review and approval to the Planning Commission or the Department of Planning, as specified in the conditions of the permit. *The plan shall contain the minimum requirements established in the conditions governing the Conditional Use Permit.* (emphasis added).

St. Louis County, Mo., Rev.Ordinances § 1003.181.10 (1988). The parties disagree as to the meaning of the provision's "minimum requirements" standard. Defendants interpret the standard to mean that the FDP may deviate from the CUP but must be "equivalent or better." Plaintiffs concede that the Planning Commission is authorized to approve an FDP that does "more" than the minimum standard requires, as long as the Commission considers more to be better. However, plaintiffs argue that the Commission here repudiated the CUP's minimum requirements and substituted an altogether different landfill that it considered superior.

Plaintiffs in their arguments make frequent references to the Preliminary Development Plan the original developer submitted together with its Application for the CUP. We note, however, that our review is restricted to a comparison of the FDP against the CUP; the Preliminary Development Plan accompanied the CUP Application, but the Council in authorizing the CUP did not require that the CUP conform to the details of the Plan. Further, the

---

**5.** The term "site development plan" used in this provision is synonymous with the term "Final Development Plan" used in Resolution 3187, which authorized the CUP.

governing county ordinance does not require that the Planning Commission approve the Preliminary Development Plan as a precondition to CUP approval, nor does it require that the development conform to the detail of the preliminary plan. The ordinance states only that the FDP must meet the "minimum requirements" of the CUP, and the Preliminary Development Plan is contemplated only as accompanying material to the Application for CUP.[6] St. Louis County, Mo., Rev.Ordinances §§ 1003.181.8 and 1003.181.10 (1988). It is on these points that we may distinguish the cases plaintiffs cite.

Plaintiffs direct us to the case of *Greater Garden Ave. Area Assoc. v. City of Webster Groves*, 655 S.W.2d 760 (Mo.App. 1983), a challenge to the City's issuance of a special use permit to Webster College. *Greater Garden* does not determine the proper standard of compliance with the ordinance in question. Rather, the court found the ordinance contained conditions and requirements sufficiently specific to adequately guide the city council in overseeing the proposed construction, so that the council's administrative discretion was properly limited. *Id.* at 768. Further, the ordinance in question specifically required the developer to adhere to the site plan originally submitted. *Id.*

Similarly, the case of *Treme v. St. Louis County*, 609 S.W.2d 706 (Mo.App.1980), does nothing to aid plaintiffs' case. *Treme* involved an appeal from a judgment upholding the constitutionality and validity of a county ordinance rezoning a tract of land that abutted plaintiffs' property. Plaintiffs in their constitutional argument contended that the county planning commission lacked adequate standards to guide its approval of the final development plan at issue. *Id.* at 713. Again, the court found that the coun-cil had in its ordinance established extensive conditions and requirements to be met by the developer, and that such conditions and requirements were sufficiently specific to guide the planning commission. *Id.* at 715. Further, the council ordinance specifically required the developer to adhere to the preliminary plan, in contrast to the case now before us. *Id.* *Treme* specifically notes that "[m]atters such as the composition of the sight-proof fences and buffering required by the ordinance and compliance with County and State standards for traffic and water-runoff are properly left to the administrative body within the guidelines established by the Council." *Id.* Thus, the Planning Commission in the present case is free to exercise some degree of discretion in approving the FDP as conforming to the "minimum requirements" of the CUP, as set forth by the Council.

Finally, plaintiffs cite *McCarty v. City of Kansas City*, 671 S.W.2d 790 (Mo.App. 1984), for the proposition that a development is precluded if not conforming to the detail of the preliminary plan. Once again, the case is distinguishable because the ordinance in question required the submission and *approval* of a preliminary development plan as an integral part of the ordinance, and further required that the developer submit a final development plan in substantial compliance with the preliminary plan. *Id.* at 793–94. Defendants urge us to apply the *McCarty* "substantial compliance" standard in comparing the FDP to the CUP. We decline to do so, however, because the *McCarty* standard was specifically set forth in the ordinance at issue in that case, and the standard referred to the FDP's conformity with the preliminary development plan, not its conformity with a CUP.[7]

**6.** Contrast the ordinance at issue in *McCarty v. Kansas City*, 671 S.W.2d 790 (Mo.App.1984).

**7.** As a peripheral issue, plaintiffs argue that defendant Halls Ferry Investments was required to initiate the ordinance's procedure for amendment because defendant made substantial deviations from the CUP. The ordinance, however, states only that the property owner or authorized representative is the party who is to initiate the procedure, but provides no instances that would require the party to do so. St. Louis County, Mo., Rev.Ordinances § 1003.181.11 (1988). Further, defendant's initiation of the amendment procedure would afford no relief to plaintiffs, in that the ordinance states only that the Planning Commission *may* require a new public hearing on the proposed amendment if the Commission determines the requested changes are not consistent in purpose and content with the nature of the proposal as originally

We turn to a comparison of the conditions contained in the CUP and FDP. In so doing, we are guided by the "minimum requirements" standard of § 1003.181.10 and by *Treme's* sanctioning of the Planning Commission's exercise of limited discretion. We are also mindful of the scope of our review, as previously explicated.

Plaintiffs allege that the FDP fails to conform to the CUP in four respects: the requirements for daily cover, airspace volume, continuous fencing, and sludge removal. The conditions as to the cover, sludge, and fencing are stated in the CUP; however, the CUP does not specify a maximum volume. Nevertheless, plaintiffs argue there is an implied maximum because the preliminary site plans considered by the Council in authorizing the CUP contained recitations of a volume that has since been greatly surpassed. We consider each of the conditions in turn.

### A. Daily Cover

■ The daily cover condition of the CUP is listed at 8d under the heading, "Sanitary Landfill Operation Standards." It reads, in part: "At the end of each day's fill a clean earth cover of at least six inches in thickness must be spread and compacted over the entire fill area." St. Louis, Mo., County Council Res. 3187 (March 3, 1983). The corresponding condition of the FDP provides, in part: "At the end of each day's operation, the daily landfill cell will be covered with at least six inches of clean earth cover which may include sand. This cover material will be spread and compacted as required." New Halls Ferry Landfill Final Development Plan, p. 11. Plaintiffs argue that sand does not meet the CUP's "clean

earth" requirement because the term "earth" denotes soil. Plaintiffs further argue that the CUP in requiring "clean earth" cover authorized a "dry" rather than "wet" landfill that was designed to minimize the infiltration of water and retard the formation of leachate and gas.

In support of their arguments, plaintiffs primarily cite documents prepared by the original developer and presented to the Council as accompaniments to the Petition for CUP. Again, we note that our review includes an examination of documents beyond the CUP and FDP only so far as those documents serve to explicate the CUP and FDP themselves. The Council did not incorporate into the CUP the preliminary plans cited by plaintiffs, nor did it specify that the cover be comprised of "soil" or that the landfill be "dry."

As to plaintiffs' first argument, the record reflects conflicting evidence as to whether the definition of "clean earth" may include sand.[8] Plaintiffs' sanitary engineering expert testified that sand, as disintegrated rock, does not fit within the definition of "clean earth", which denotes soil. Defendants' witnesses testified otherwise: Leon Golfin, the Waste Management Chief of the Department of Community Health and Medical Care, testified that "clean earth" fill is comprised of reasonably clean materials, including river sand, that occur in the earth. Similarly, Robert Robinson, an engineer and the project manager for the landfill, testified that sand, as an earth material, meets the CUP condition. Still further, Glen Powers, Land Use Supervisor of the Department of Planning, testified that the CUP left open the specific

---

advertised for public hearing. *Id.* The Commission here found the FDP in compliance with the CUP, so it would not likely have exercised its discretion to require the hearing by finding any proposed change inconsistent in purpose and content. Plaintiffs, therefore, would not have been heard even if defendant had sought an amendment.

**8.** We note, in passing, that we are not persuaded by defendants' contention that the trial court did not have jurisdiction over the subject matter of the type of daily cover. Defendants argue that the type of daily cover is a licensing issue,

and that plaintiffs, having failed to timely seek judicial review of the license's issuance, are precluded from addressing the issue in this appeal. St. Louis County, Mo., Rev.Ordinances § 607.730(3) (1987). Defendants' argument is without merit. The broad issue before this court is whether the trial court erred in affirming the Planning Commission's decision to approve the FDP as conforming to the minimum requirements of the CUP. Because daily cover is a requirement of the CUP, we must examine the condition to determine whether the FDP is in conformity.

type of material that could permissibly be used for cover. Deferring to the trial court's determination of the witnesses' credibility, *Phipps*, 645 S.W.2d at 96; Rule 73.01(c)(2), we find substantial evidence that the CUP's "clean earth" cover requirement could include sand.

Plaintiffs next contend that the CUP authorized a "dry" rather than "wet" landfill. Witnesses for both parties testified that the use as daily cover of sand rather than soil would cause faster infiltration of water and consequently more rapid leachate and gas formation. However, even plaintiffs' witness testified that a "wet" landfill that encourages infiltration is not necessarily worse than a "dry" one, in that the choice of design merely depends upon whether the goal of the landfill is to enhance degradation and gas formation (wet) or to limit the amount of moisture and leachate (dry). Further, defendants' witnesses disputed the accuracy of using the terms "dry" and "wet" to describe landfills in the engineering sense, because they consider all solid waste landfills "wet" in that the fills contain a large quantity of moisture that will increase over time, regardless of cover. The trial court heard testimony that many factors other than daily cover affect the moisture content of a landfill, including the slope of the final cover material, the final cover material itself, and the developer's compliance with regulations of the Department of Highways and Traffic governing the control of storm-water and surface run-off.

As to the increased gas and leachate production, the record includes testimony that more rapid formation of leachate is not "worse" than slower formation, because the landfill developer will have to treat the leachate at some point regardless and will plan and engineer for that situation. Defendant developer in this case has engineered to accommodate the leachate through a dilute system which includes a high volume pumping capacity and a treatment system that includes aeration and sedimentation. Further, the record contains evidence that the developer will handle any increased rate of gas production by use of a collection system already partially constructed and scheduled to go into operation when the landfill reaches 60 feet above the bottom of the quarry.

In determining whether the FDP condition meets the "minimum requirements" of the CUP, we are mindful of our "substantial evidence" scope of review. *Murphy*, 536 S.W.2d at 32. As we have discussed, the record contains voluminous evidence indicating that the use of sand as opposed to soil meets all the minimum requirements a "clean earth" cover is designed to address,[9] and, with respect to the daily cover's function as a barrier to moisture, that the landfill design accommodated any changes resulting from the use of sand rather than soil. Further, the record cites advantages to the use of sand, in that it precludes concentrated leachate formation, its use reduces the necessity of using trucks to transport soil, and the plentiful supply near the landfill ensures thorough daily cover and fire control. In sum, we find substantial evidence to support the trial court's determination that the FDP met the minimum requirements of the CUP as to the daily cover condition.

### B. Airspace Volume

As noted earlier, the CUP does not specify a maximum airspace volume. Nevertheless, plaintiffs urge us to imply a volume condition based upon the preliminary plans submitted to the Council as accompaniments to the original developer's Application for CUP. We decline to do so, in that our review is limited to a determination of whether the conditions in the FDP conform to those in the CUP, and neither the CUP nor the FDP contains a volume restriction. We do note, however, the record reflected evidence that the landfill had increased its capacity through better use of heights and slopes and as a result of changes, improve-

---

9. The evidence indicates that the main purposes of daily cover are unrelated to moisture infiltration. Rather, the temporary cover serves to prevent wind blowing of waste, discourage animals from feeding on the waste, mask immediate odors, and create an aesthetic barrier to the appearance of landfill material.

ments, and efficiencies in the engineering design. Further, the County Land Use Supervisor stated that the change in volume was not substantial and was within the bounds of the permit language. The Planning Commission was entitled in determining this issue to exercise discretion within the guidelines set by the Council in the CUP. *Treme*, 609 S.W.2d at 715. It is not our function to question whether the CUP should have specified a maximum volume; the propriety of the Council's issuing the CUP in the first instance is not now before this court. *See Hais*, 670 S.W.2d at 497.

### C. Fencing

■ The CUP condition concerning fencing provides: "[T]he petitioner shall be required to construct a continuous eight foot high chain link fence topped by barbed wire along the required buffer zone on the east and northeast perimeter of the Conditional Use Permit." St. Louis, Mo., County Council Res. 3187 (March 3, 1983). The FDP contains almost identical language: "A continuous 8-foot-high chain link fence topped by barbed wire will be constructed a minimum of 25 feet from the property line along the east and northeast perimeter of the Conditional Use Permit buffer zone prior to starting landfill operations." New Halls Ferry Landfill Final Development Plan, p. 6.

The drawings submitted as part of the FDP include a depiction of the fence, together with a notation that the fence will be 8-foot high chain link topped with barbed wire and set back to allow for the buffer required by the CUP. Plaintiffs argue that given the topography of the site it would be impossible to construct a continuous fence as depicted in the drawings. The County Land Use Supervisor and the landfill project manager disagreed, testifying that the fence as depicted in the FDP drawings was consistent with the CUP fencing condition, and that it was possible

to construct a fence as drawn in the FDP. Defendant developer did admit, however, that the fence as *actually built* is not continuous. There is at one point as the fence goes into the quarry a distance of less than one horizontal foot and three vertical feet separating the top of one fence pole and the bottom of the adjacent pole. As noted earlier, we assume that all fact issues were found in accordance with the result reached because the parties did not request, nor did the trial court make, findings as to controversial fact issues according to Rule 73.01. *Horn*, 720 S.W.2d at 748. Therefore we assume the trial court found the fence effectively continuous and in compliance with the continuous fencing condition of the CUP.

We reiterate that our review of the issue is limited to a determination of whether the FDP conformed with the CUP conditions, giving due weight to the Planning Commission's exercise of administrative discretion. *Treme*, 609 S.W.2d at 715. The question of whether the development as constructed conforms to the FDP is not before us. If the fence as built is not continuous, it is a problem of zoning enforcement to be addressed by St. Louis County, not by this court. We find substantial evidence to support the conclusion that the FDP conforms to the fencing condition of the CUP.

### D. Sludge

■ The condition of the CUP relating to sludge reads:

> Prior to the issuance of a license to operate a landfill [10], the petitioner shall submit proof of a contract for sludge removal from the leachate basin per the standards of the Department of Community Health and Medical Care and the Missouri Department of Natural Resources.

St. Louis, Mo., County Council Res. 3187 (March 3, 1983). The corresponding provision of the FDP states:

10. We note defendant's averment that the trial court lacked jurisdiction of the sludge condition, in that the subject is a licensing issue. St. Louis County, Mo., Rev.Ordinances § 607.730(9) (1987). (See note 8 for a similar argument with respect to daily cover.) We find no jurisdiction-

al barrier to a consideration of the CUP sludge condition as compared to the corresponding condition in the FDP. We do not reach the issue of defendant developer's compliance with the licensing provision.

Halls Ferry Investment Company does not need a contract for removal and disposal of the sludge from the leachate treatment system because the sludge will be a nonhazardous waste and can be disposed of in the sanitary landfill. New Halls Ferry Landfill Final Development Plan, p. 10. Plaintiffs argue that the on-site disposal outlined in the FDP fails to meet the minimum requirements of the CUP, which calls for removal of the sludge from the site prior to disposal.

The record reflects that the developer tests the sludge prior to disposal to determine whether it is hazardous according to Missouri Department of Natural Resources standards. Any material disposed of in the New Halls Ferry Landfill will be nonhazardous. Further, the Waste Management Chief of the Department of Community Health and Medical Care testified that on-site disposal was superior to the CUP's removal requirement because, since the sludge would not have to be transported to another landfill or incinerator for disposal, there was no risk of spillage onto the roadways. The witness further testified that on-site disposal was superior because his Department would be able to oversee the sludge's handling. Similarly, the Waste Management Chief of the Department of Community Health and Medical Care testified that he accepts the defendant developer's contracting in-house to remove the sludge. Finally, the record reflects the Department recommended approval of the FDP with the knowledge that it would have continuing supervision over the sludge disposal under Chapter 607, St. Louis County Revised Ordinance, which was in the drafting stage at the time the FDP was approved. St. Louis County, Mo., Rev.Ordinances § 607 (1987). Given this evidence and *Treme's* recognition of administrative discretion, we find substantial support for the trial court's finding that the FDP condition as to sludge conformed with the CUP.

As a final comment to our finding substantial evidence to support the trial court's affirming the Planning Commission's decision, we note the voluminous record reflecting careful scrutiny of every aspect of the landfill operation. The FDP was reviewed for eight months by the Department of Planning and approved only after the developer responded to numerous concerns cited by the Departments of Community Health and Medical Care, Public Works, Highways and Traffic, and Parks and Recreation. In fact, the facility had been under consideration by these departments for four years prior to the issuance of the CUP in the first instance, and the developer has complied with the escalating requirements of the departments listed as well as those of the Department of Natural Resources over the entire seven-year period leading to the FDP approval. The operation is subject to strict, continuing supervision, and the developer must seek annual renewal of its permit. The County departments will not permit the facility to operate as a hazard to the community. Although we do not consider the propriety of the CUP's approval in the first instance, it is important to note that St. Louis County has throughout its approval process considered the landfill's safety and compatibility with the surrounding area and its effect on the health and welfare of the County's residents. In fact, the Waste Management Chief of the Department of Community Health and Medical Care considers the landfill as depicted in the FDP the best ever submitted to the Department of Planning for development at that site.

The trial court in exercising de novo review of the administrative determination properly affirmed the Planning Commission's decision. Guided by Rule 73.01 and our scope of review as previously stated, we find the trial court's judgment to be based upon competent and substantial evidence that the Final Development Plan met the minimum requirements of the Conditional Use Permit.

We dismiss the appeal of corporate plaintiff Citizens for Safe Waste Management and in all other respects affirm the judgment of the trial court.

GARY M. GAERTNER, P.J., and CRIST, J. concur.