**STATE of Missouri, ex rel. KARSCH, et al., Appellants,**

**v.**

**CAMDEN COUNTY, Missouri, Board of Adjustment, Respondent.**

No. SD 29668.

Missouri Court of Appeals, Southern District, Division One.

Jan. 27, 2010.

*v. Friendly Am., Inc.,* 606 S.W.2d 457, 460 (Mo.App.1980)).

John W. Roe and Mark H. Epstein, Kansas City, for Appellant.

Harvey M. Tettlebaum, R. Ryan Harding and John M. Roodhouse, Husch Blackwell Sanders, LLP, Jefferson City, for Respondent.

ROBERT S. BARNEY, Judge.

Appellant John Karsch ("Mr. Karsch") and BA Sales, Inc. (collectively "Applicant") petitioned for writ of certiorari to challenge a decision by the Camden County Board of Adjustment ("the Board") which denied Applicant's request for a conditional use permit ("CUP") on its property located in Camden County, Missouri. In its Findings and Judgment, the trial court upheld the decision of the Board. On appeal, Applicant essentially maintains in its sole point relied on that the Board erred in denying its application for a CUP to permit it to use its property for a "less intense use than it [was] currently zoned for because there was no competent and substantial evidence to support the Board's denial" and the alleged evidence in opposition was "against the weight of the evidence in support of the application consisting of expert testimony and exhibits."

"An appellate court reviews the findings and conclusions of the [Board] and not the judgment of the trial court." *State ex rel. Teefey v. Bd. of Zoning Adjustment*, 24 S.W.3d 681, 684 (Mo. banc 2000); *see Animal Shelter League of the Ozarks,* *Inc. v. Christian Cty. Bd. of Adjustment*, 995 S.W.2d 533, 537 (Mo.App.1999). "[N]either 'this Court nor the [trial] [c]ourt may try the matter de novo or substitute our judgment for that of the administrative tribunal.'" *Wolfner v. Bd. of Adjustment*, 672 S.W.2d 147, 150 (Mo.App.1984) (quoting *Stockwell v. Bd. of Zoning Adjustment*, 434 S.W.2d 785, 789 (Mo.App. 1968)). We do not reweigh the evidence. *Versatile Mgmt. Group v. Finke*, 252 S.W.3d 227, 233 (Mo.App.2008). This court will not "disturb [the Board's] decision unless it is clearly contrary to the weight of the evidence." *Medusa Aggregates Co. v. City of Columbia*, 882 S.W.2d 223, 224 (Mo.App.1994). "The scope of review is limited to determination of 'whether the Board's action is supported by competent and substantial evidence[ 1] upon the whole record or whether it is arbitrary, capricious, unreasonable, unlawful, or in excess of its jurisdiction.'" *Teefey*, 24 S.W.3d at 684 (quoting *Hutchens v. St. Louis Cty.*, 848 S.W.2d 616, 617 (Mo. App.1993)); *see also Moto, Inc. v. Bd. of Adjustment*, 88 S.W.3d 96, 99 (Mo.App. 2002). "In determining whether substantial evidence existed to support the [Board's] decision, an appellate court must view the evidence and reasonable inferences therefrom in a light most favorable to the decision." *Teefey*, 24 S.W.3d at 684. If the evidence would support either of two different, opposed findings, this Court is bound by the determination of the administrative agency. *Versatile*, 252 S.W.3d at 233. "A question of law is a matter for the independent judgment of the reviewing court." *Teefey*, 24 S.W.3d at 684.

"Conditional or special use permits allow a land use authorized by a local

1. "Substantial evidence is defined as 'competent evidence which, if believed, would have probative force upon the issues.'" *Windy Point Partners, L.L.C. v. Boone Cty. Comm'n.*, 100 S.W.3d 821, 825 (Mo.App.2003) (quoting *Ford Leasing Dev. Co. v. City of Ellisville*, 718 S.W.2d 228, 233 (Mo.App.1986)).

legislative body and deemed conducive to the general welfare of the community, but which may be incompatible with the basic uses in the particular location in relation to surrounding properties, unless certain conditions are met." *State ex rel. Columbia Tower, Inc. v. Boone Cty.*, 829 S.W.2d 534, 538 (Mo.App.1992); *see also Ode v. Bd. of Zoning Adjustment*, 796 S.W.2d 81, 83 (Mo.App.1990).

Sections 404 and 408 of the Camden County Unified Land–Use Code ("the Code") govern applications for CUPs in Camden County, Missouri. Section 408 sets out:

2. The [CUP] is intended to provide a public hearing review process for land uses that are conditionally allowed in a particular zoning district, but which potentially have certain aspects that indicate that thorough review is appropriate. . . .

3. Subject to Subsection 4, the Planning Commission shall issue the requested permit with appropriate conditions unless it concludes, based on the information submitted at the hearing that:

  a. The requested permit is not within its jurisdiction to decide upon, or

  b. The application is incomplete, or

  c. If the development is completed as proposed it will not comply with one or more requirements of the [Code] that the Planning Commission is unwilling to vary.

4. Even if the Planning Commission feels that the application complies with all other provisions of this regulation, it may still deny the permit if it concludes, based upon the information submitted at the hearing, that . . . the development, more probably than not:

  a. Will materially endanger the public health or safety, or

  b. Will substantially injure the value of adjoining or abutting property, or

  c. Will not be in harmony with the area in which it is to be located, or

  d. Will not be in general conformity with the Master Plan or any other plan adopted by the County Commission.

5. The burden of presenting a complete application to the Planning Commission shall be upon the applicant. . . .

6. The burden of presenting evidence and of persuading the Planning Commission that the development, if completed as proposed, will comply with the requirements of this regulation shall fully and completely fall upon the applicant or his representatives.

Section 64.660 [2] and section 310 of the Code both set out the duties and powers of the Board in its determination of appeals brought before it. Section 310 of the Code states:

1. The Board . . . shall have the following powers and it shall be its duty:

  a. To hear and decide appeals where it is alleged there is error of law in any order, requirement, decision, or determination made by an administrative official in the enforcement of this Code.

  b. To hear and decide all matters referred to it or which it is required to determine under these Regulations, including, without limitation . . . (iii) appeals from decisions of the Planning Commission regarding [CUPs]. . . .

The record reveals that Applicant is the owner of two parcels of land located in Camden County. The parcel of property at issue here ("the Property") consists of 7.61 acres bordering the Lake of the Ozarks on three sides and is zoned as "B–2

2. All statutory references are to RSMo 2000.

(General Commercial)." [3] The improvements on the Property consist of a marina and several commercial boat docks. The other parcel owned by Applicant consists of 3.22 acres which is adjacent to the Property, zoned as R–1, and has no stated improvements.[4] Initially, Applicant desired to build condominiums on both parcels and in January of 2007, it filed applications with the Camden County Planning and Zoning Commission ("the PZC") for CUPs to build a condominium complex on the properties and to rezone the 3.22 acre parcel from R–1 to R–3, which is referred to as "High Density Residential." In its application, Applicant requested approval to build 180 units on the combined properties.

Hearings were held by the PZC on January 17, 2007, and on February 21, 2007. Prior to the vote of the PZC, Applicant agreed to reduce the number of potential condominium units from 180 to 165. At the latter proceeding, the PZC voted 6–3 to deny the project on the properties. Applicant ultimately appealed the decision relating to the properties to the Board per section 310 of the Code.

The Board held a public hearing on March 28, 2007. At the hearing, Applicant's representative, Mark Epstein ("Mr. Epstein"), related that Applicant desired to reduce the number of potential condominium units from 165 to 129 and declared that Applicant would also agree to keep the 3.22 acre parcel as undeveloped green space. He also proposed making various public improvements to the area in which the Property was located such as repairing roadways and adding an additional water tower to serve the Property as well as 285 people in the surrounding residential area. Mr. Epstein argued that the use of the property as R–3 high density residential is actually a decrease "in the density of the zoning from what is already characterized as a B–2 general commercial district. . . ." He maintained there would not be much increased traffic flow in the area based on the nature of condominium units and the fact that they are vacant a great deal of the time. He related Applicant could utilize this property by building a nightclub, a restaurant, a bar, or a trailer park under the current zoning of the Property and that a condominium complex was certainly better than these alternatives as far as having a negative impact on the area. Mr. Epstein also related there would not be a significant increase in boat or dock traffic, and that he did not yet know how many boat slips would be approved for use with the condominium complex.

Matt Marschke ("Mr. Marschke"), an engineer with Midwest Engineering, testified that the total land coverage proposed by Applicant was only half of what it could be under the current B–2 zoning; that the project contained more green space than other projects in the area; and that his feasibility study revealed the best use of the Property would be for condominium development.[5] He further testified the granting of a CUP on the Property would not affect the roadway safety of the surrounding area because the roads in that area are "superior" and "much less con-

---

**3.** The original application stated the Property was 7.46 acres, but a later survey introduced at the hearing before the Board set out that it consisted of 7.61 acres. We shall use this latter number in this opinion.

**4.** The testimony at trial reveals the surrounding properties are predominantly zoned "R–1 Low Density Residential with some R–2 zon-

ing not far away. No high density residential uses are nearby; however, [the marina on the Property] is B–2 zoned, which is somewhat equivalent to . . . R–3 in density."

**5.** The feasibility study was also reviewed by the Board.

gested ..." than most roads in the lake area and he related that he had reviewed records from the Missouri State Highway Patrol which reported but one traffic accident in the area in the last five years. He also related that Applicant planned to improve the access road "to even a better standard than it is now." As for water safety, he related there would be no more docks built under the CUP than could be built under the current B–2 zoning and he observed that the Missouri Water Patrol had recently rejected Applicant's request for a no wake zone in the cove due to a lack of accidents in the past as well as a lack of dense use. Mr. Marschke also related that Applicant was exploring building an on-site wastewater treatment plant and was exploring several options for the Property's drinking water supply.

Jeff Krantz ("Mr. Krantz"), a real estate agent, testified that he had a long involvement with the development of condominium projects and opined that the "absolute best use" of the Property was as a condominium complex versus other options available under the current B–2 zoning such as bars and restaurants. He stated that similar condominium projects in the area did not have a detrimental effect on the resale value of neighboring homes.

Loren Woodard ("Mr. Woodard"), a real estate appraiser, related that the current B–2 zoning was "outdated" and "unreasonable" for the Property. He testified that condominiums do not have a negative impact on the value of the surrounding property; that the existing marina cannot support the land cost of the property; that the occupancy rate of a typical condominium unit on a typical weekend is "in the 25 percent range at the upper end" such that traffic would not be affected in the area on a regular basis; that condominiums do not generate a significant increase in traffic in comparison to other uses; and that the "highest and best use estimate for the [P]roperty ... is for condominium development."

The record shows that Chris Hall ("Mr. Hall"), a staff representative of the PZC, indicated that the staff had recommended approval of the CUP. However, Mr. Hall took no position at the Board hearing "[s]ince the [PZC] voted to deny this case by a significant majority, their recommendation by the Administrator is appropriate and would be redundant." Further, he did submit a list of half a dozen minimum requirements that would need to be met in the event the CUP was approved by the Board.

Additionally, there was testimony before the Board from various local landowners and concerned citizens. Bill Cason, a local landowner, testified that many people were concerned about the possibility of the CUP being granted on the Property and there had been a great deal of testimony from citizens at the PZC hearing. He related that "300 homes ... would be detrimentally affected by shoving 120 condominiums on this little spit of land in the middle of [a] neighborhood." He testified that

> if we take 120 condominiums in the middle of a residential area on ... blacktop road that currently serves 175 people, but now we're going to double—or more than double and ... put 200 more cars. Sure that's going to be a detriment to the value of our homes. It's our safety for sure.

It was his opinion that the high density development was not in harmony with the area which is composed mainly of single family homes and "people that [have] families or [are] retired."

Nill Mohler, who lives near the Property, pointed out that the maximum residential density allowed on a R–3 zoned property is 17 units per acre and the Property proposes to have 126 units on 7 acres,

which is the maximum number allowed. He stated that he felt construction on the Property would be a nuisance as well as a hazard to residents and would damage the roads and the infrastructure of the area such that the area would suffer "a degradation [in their] lifestyle." He also expressed concern for the safety of the wells and septic systems in the area due to the fact that a large amount of rock would have to be blasted from the Property during the construction process and he wondered whether Applicant was prepared to indemnify them for such damage. He also questioned the financial feasibility of such a large scale development given the glut of condominiums for sale in the surrounding area.

Larry Chubbuck ("Mr. Chubbuck") testified that while the small roads that lead to the Property were fairly accident free, they essentially feed into the larger roads in the area which were often the site of wrecks and dangerous accidents. He stated that such a development would greatly increase the amount of traffic in the area and would damage the roads. He related, "[h]ow in the world is a 130 condo unit going to help anything as far as lessening congestion of traffic on the roads?" Mr. Chubbuck also related there would be far more boat slips once the condominium project got underway and he quoted a local real estate office for the proposition that "the property adjacent to the complex will be affected negatively in value and the pool of people who will even take a look at this property in the future will drop dramatically." Indeed, "the further the home is from the complex, the less the impact there is on the value of the property." He suggested the Property could best be used if it were subdivided into tracts for single

family homes because it would "fall in line with the rest of the neighborhood." He declared that "[a]s of yesterday, there were 1,110 condo units available on the market on this lake" and he questioned whether the project would even be completed based on the already existing number of condominiums for sale in the area. In closing he asked that

> this condo project not be allowed to destroy the investment that so many people have worked so hard to get and many are probably working a second job so they can afford a second home or their primary home at the lake. Please don't take away their skyline and replace it with the side of a tall condominium complex or replace their relaxing view of tiny ripples on the lake with the roof of a huge boat dock protruding well into the lake.

Lee Mollicone testified that her concern was with the density of the project and the effect the increased boat traffic and number of boat docks would have on the cove. She related "things will change, but the size of this cove will not change. It is static. . . . You're talking about adding another possible 200 watercraft to this area." She projected that such an increase in lake use in the area was "very, very dangerous." She related she was unconcerned with the lack of previous accidents on the lake and she was instead concerned about accidents occurring in the future. She encouraged the Board to reject Applicant's appeal based on the proposed density of the development.

Peggy Bull testified she was concerned about the inevitable increase in traffic on already unsafe roads and she felt such a large scale development would ruin the character of the area.[6]

---

**6.** Another resident, Robert Williams, also spoke at the hearing but his testimony was

not properly recorded and was inaudible.

In addition to the lay witness testimony before the Board, the Board received in excess of 30 letters from neighboring landowners and others in the community in opposition to the CUP for the Property. The letters expressed concern about increased automobile traffic on the roadways; the need for conservation of the trees and shoreline in the area; safety concerns linked to the increase in boat traffic; the interference with the quiet enjoyment of neighboring property due to increased noise, litter, loitering, nuisance and light; the decline in property values; and the effects on the area's infrastructure of another high density condominium development.

At the conclusion of the hearing, the Board voted to deny the appeal from the decision of the PZC. On writ of certiorari to the trial court, pursuant to section 64.660.2, the trial court declined to reverse the decision of the Board and affirmed the denial of Applicant's request for a CUP. The appeal to this Court then followed.

■ At the outset, we note Applicant filed with this Court a "Motion to Strike Respondent's 'Supplemental Legal File,' Motion to Strike Respondent's brief and Suggestions in Support." This motion was taken with the case. Having determined that there was indeed some confusion as to which documents were actually considered by the Board in making its determination, this Court ordered the trial court to confer with the parties and advise us as to what documents in the voluminous supplemental legal file filed by Respondent were actually before the Board. This task was accomplished and the trial court issued an "Order" on October 30, 2009, that determined which "parts of the contents of the supplemental legal file were presented to the ... [Board] prior to [its] decision...." We affirm this determination and we deny Applicant's motion to strike.

We turn now to Applicant's point relied which asserts the Board erred in denying the CUP application because there was not competent and substantial evidence to support such a denial in that its request was "to use [its] property for a less intense use than it [was] currently zoned for...." Applicant also maintains that such a decision was "against the weight of the evidence in support of the application consisting of expert testimony and exhibits."

■ Often in cases such as the present matter, there is expert testimony offered in addition to lay witness testimony from concerned citizens. In such situations, "[i]f evidence before an administrative body warrants either of two opposed findings, a reviewing court is bound by the administrative determination and it is irrelevant that there is supportive evidence for a contrary finding." *Animal Shelter League,* 995 S.W.2d at 543. "If competent and substantial evidence supports an administrative decision, the substantiality of contrary evidence is immaterial." *Greene Cty. Concerned Citizens v. Bd. of Zoning Adjustment,* 873 S.W.2d 246, 262 (Mo.App. 1994). As previously related, this Court reviews the evidence in the light most favorable to the Board and we give the Board's decision "the benefit of all reasonable inferences." *State ex rel. Dotson v. Cty. Comm'n,* 941 S.W.2d 589, 592 (Mo. App.1997) (quoting *Medusa Aggregates Co. v. City of Columbia,* 882 S.W.2d 223, 224 (Mo.App.1994)).

Several cases have held that lay witness testimony is sufficient to support the denial of a request for a CUP and that lay witness testimony can even be considered over expert testimony at the discretion of the administrative body rendering the decision. One example is *Windy Point,* 100 S.W.3d at 822–25. There the appellants had applied for a CUP to build a mobile home park. *Id.* at 822–23. At the hearing

before the planning commission there was expert testimony in favor of granting the CUP and lay testimony from "[s]eventeen area residents" in opposition to the application. *Id.* at 823. The application was denied by the planning commission and was appealed to the Boone County Commission where it was also denied. *Id.* at 823–24. This decision was upheld upon review by the circuit court and the appellants appealed. *Id.* at 824. On appeal to the Western District of this Court, the decision was again affirmed and the CUP request was denied. *Windy Point,* 100 S.W.3d at 828. Among the issues discussed by the reviewing court was whether the lay testimony of the citizenry on the issue of increased traffic flow was substantial and competent evidence upon which the Boone County Commission could have properly rendered its decision. *Id.* at 825. The reviewing court found:

> [t]he lay testimony here established that the road was already congested and dangerous and that the addition of several hundred vehicles a day would only increase ... existing congestion. The [Boone County] Commission was permitted to believe this evidence and, if it did, that the development failed to meet the test of the ordinance. We conclude that the combined testimony of the neighbors constituted competent and substantial evidence that the flow of traffic would be hindered if the [CUP] permit was granted.

Similarly, in *Moto,* 88 S.W.3d at 97–99, the appellants had their application for a CUP to build a service station denied by the various local administrative bodies after hearings at which lay witness testimony and expert testimony was adduced. After detailing the testimony offered by the various neighboring landowners and other concerned entities, the reviewing court found there was substantial and competent

evidence presented to support the denial of the CUP request. *Id.* at 105.

Here, Applicant's basic argument is that the Board's decision was against the weight of the evidence because it discounted the expert testimony and evidence that they presented and, instead, believed the lay testimony offered by the neighboring landowners. Applicant does not cite this Court to case law and this Court has been unable to find case law which says that an administrative body must accept and defer to expert testimony over that presented by lay witnesses. It is clear from the cases cited above that when faced with contrary evidence that could lead to different findings, this Court is bound by the Board's "determination and it is irrelevant that there is supportive evidence for a contrary finding." *Animal Shelter League,* 995 S.W.2d at 543. Indeed,

> [o]ur review of the [Board's] credibility determinations is very narrow, as the administrative entity 'is charged with passing on the credibility of all witnesses and may disbelieve testimony absent contradictory evidence and the acceptance or rejection of any lay or expert testimony may not be disturbed on review unless its acceptance or rejection is against the overwhelming weight of the evidence.'

*Windy Point,* 100 S.W.3d at 826 (quoting *Fischer v. Archdiocese of St. Louis–Cardinal Ritter Inst.,* 793 S.W.2d 195, 199 (Mo. App.1990), overruled on other grounds by *Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220, 230 (Mo. banc 2003)). We also note that while hearsay evidence was received by the PZC and the Board, "Missouri courts nonetheless hold hearsay evidence admitted without objection may be utilized as substantial and competent evidence to support an administrative agen-

cy's finding." *Animal Shelter League,* 995 S.W.2d at 541; *see also* § 536.070.

Here, there was testimony from the various lay witnesses that the granting of the CUP would cause significant increase in the traffic congestion on the roadways as well as increased boat traffic on the lake, thereby materially endangering the public health or safety of the people residing near the proposed project. *See Windy Point,* 100 S.W.3d at 825. Other lay witnesses testified they were concerned that the proposed project would destroy the quiet nature of their area due to increased nuisances such as noise, litter, loitering and light pollution. *See Moto,* 88 S.W.3d at 101–102. Lay testimony also related that such a large, high density multi-family development as proposed by Applicant did not fit in with the single-family residential area that was already established; it would have the effect of decreasing property values adjacent to the proposed project; and it would damage and strain the infrastructure of the area. These are valid concerns espoused by the very people the condominium project would affect. Further, all of these concerns are contained in the list of reasons set out in section 408.4 of the Code which support the denial of a request for a CUP. *See id.* at 101. There is no merit in Applicant's assertions that the Board's decision was against the weight of the evidence. *See Medusa,* 882 S.W.2d at 224. Neither is there any merit to Applicant's argument that there was not competent and substantial evidence to support the denial of its request for a CUP because its request was "to use [the] property for a less intense use than it [was] currently zoned for...." There is nothing in the Code or in any case law presented to this Court which sets out that where a party requests a less dense zoning use, such a CUP request should be automatically granted. As already stated, we examine the evidence in the light most favorable to the Board and give the Board's decision "the benefit of all reasonable inferences." *State ex rel. Dotson,* 941 S.W.2d at 592. Having already found the Board's decision was not against the weight of the evidence, we are likewise convinced there was competent and substantial evidence to support its decision. See *Teefey,* 24 S.W.3d at 684. The Board did not err in denying Applicant's request for a CUP. Point denied.

The trial court's judgment upholding the Board's decision is affirmed.

BATES, P.J., and BURRELL, J., concur.

