

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

STATE OF MISSOURI AT THE )
RELATION OF: LAURIE LEWIS, )
ET AL., )
  )
          Appellants, )
  )
v. ) WD86182
  )
BOARD OF ZONING ADJUSTMENT,)   Opinion filed: April 2, 2024
PLATTE COUNTY, MISSOURI AND )
CKC HOLDINGS, LLC, )
  )
          Respondents. )

**APPEAL FROM THE CIRCUIT COURT OF
PLATTE COUNTY, MISSOURI
THE HONORABLE THOMAS FINCHAM, JUDGE**

Division Three: Mark D. Pfeiffer, Presiding Judge,
Lisa White Hardwick, Judge and W. Douglas Thomson, Judge

This appeal arises from the judgment of the Circuit Court of Platte County ("trial court") affirming the decision of the Platte County Board of Zoning Adjustment ("the BZA") to grant CKC Holdings, LLC ("CKC") a Special Use Permit ("SUP") for the construction of a self-storage facility. Appellants, who are neighboring property owners in opposition to the self-storage facility, raise two points on appeal, arguing that the BZA erred in granting the SUP. First, they assert

the proposed special use is contrary to law and unsupported by competent evidence because it does not meet certain, applicable standards under the Platte County Zoning Order of 1990 ("Zoning Order").[1]  Second, Appellants contend the proposed special use is contrary to law because it is barred by the doctrines of *res judicata*, collateral estoppel, and the law of the case.  For the reasons discussed herein, we affirm.

## Factual and Procedural History[2]

In October 2021, CKC filed an application for a SUP with the Platte County Planning and Zoning Commission ("Planning Commission") in order to construct a self-storage facility on a 30.14-acre parcel of land ("Property") zoned "CH", or "Highway Commercial District" in Platte County, Missouri ("the 2021 application").  The Property[3] is bordered on the south by NW Tiffany Park Road, across from which sits a vacant 9.8-acre lot, a Missouri Department of Transportation ("MODOT") maintenance barn, a construction lay down yard, and a fire station, offices, and a training facility for the Southern Platte Fire Protection District.  The Property is bordered on the west by Highway N at the south point to

---

[1] All statutory citations are to the Platte County Zoning Order of 1990 as updated through January 2021, unless otherwise stated.  The Zoning Order was adopted and enacted by the County Commission of Platte County.  For all purposes herein, this "order" of the Commission may fairly be construed as an "ordinance."

[2] "We 'view the evidence and reasonable inferences therefrom in a light most favorable to the [BZA's] decision.'"  *Four B. Corp. v. City of Harrisonville*, 667 S.W.3d 169, 171 n.1 (Mo. App. W.D. 2023) (alteration in original) (quoting *Antioch Cmty. Church v. Bd. of Zoning Adjustment of City of Kan. City*, 543 S.W.3d 28, 34 (Mo. banc 2018)).

[3] In very general terms, one could say the Property almost sits at the northwest corner of I-435 and NW Tiffany Park Road.

an approximated point where Highway N curves west (away from the Property), with the remainder of the west line being land zoned R-80 (Rural Single-Family) and Rural Estates (RE), and being comprised of single-family dwellings and vacant lots.  On the north and east the property is bordered by a forty-two-acre tract of land which, like the Property, is zoned CH.  Interstate 435 is approximately 600 feet east of the Property, just east of that portion of the forty-two-acre tract zoned CH sitting east of it.

According to the site plan submitted with the SUP application, the project will be built in two phases.  The self-storage facility consists of nine total buildings (one office/enclosed climate-controlled self-storage building and eight enclosed self-storage buildings), two covered outdoor parking areas, and two uncovered parking/outside storage areas.  The self-storage buildings form a perimeter within which all outdoor parking and storage areas sit.  Ultimately, the facility will provide 756 storage spaces consisting of 656 individual storage units, fifty covered parking spaces, and fifty uncovered parking/storage spaces.  Landscape buffers will be placed along NW Tiffany Park Road, and the western border of the property including Highway N.  The site plan also includes an area for a septic system and lateral feed for the office bathroom, as well as an area for a storm water detention basin.

This is not the first time CKC has sought a SUP for this purpose on the Property.  In 2017, CKC filed its first application to construct a self-storage facility, which was approved by the Planning Commission by a four-to-three vote.  Local

residents appealed the Planning Commission's decision to the BZA, which voted to reverse the decision of the Planning Commission by a three-to-one vote, thereby denying the SUP application. CKC filed a writ of certiorari in the Circuit Court of Platte County, which affirmed the BZA's decision. On appeal to this court, the decision of the circuit court was affirmed. *State ex rel. CKC Holdings, L.L.C. v. Bd. of Zoning Adjustment*, 578 S.W.3d 860 (Mo. App. W.D. 2019) (per curiam). In 2020, the Planning Commission denied another SUP application by CKC, which was "very similar" to the 2017 application. In early 2021, CKC again applied for a SUP after making significant changes to the application, but this application was also denied by the Planning Commission. CKC appealed that denial to the BZA and the BZA also denied the SUP.

This brings us to the current application, where additional, substantial changes were made in December 2021. A staff report was prepared for the Planning Commission, in which staff provided no recommendation for the SUP application due to it being the fourth time the Planning Commission has heard the request. Nonetheless, the report found in relevant part that the requested special use complies with the applicable Zoning Order requirements, that adequate access roads will be provided, and adequate utility, drainage and other necessary improvements and facilities have been or will be provided. The Planning Commission, following a hearing on December 21, 2021, approved the application by a vote of seven-to-four and granted the SUP for a period of thirty-five years, with the following conditions:

4

2. That the APPLICANT perform a ½ street road improvement consisting of widening NW Tiffany Park Road to 24 feet and adding a 4 inch asphalt overlay to the specifications of the Platte County Department of Public Works. Said improvement should be completed in conjunction with Phase 1.

3. That the proposed Landscape Buffer plantings be installed in conjunction with Phase 1.

4. That the APPLICANT dedicate 30 feet of right-of-way from the centerline of NW Tiffany Park Road along the frontage of the property. Said right-of-way will be dedicated by a separate document.

5. That the APPLICANT work with Staff to improve the line of sight triangle at the intersection of Highway N and NW Tiffany Park Road, by grading the southwest corner of the property and moving the Landscape Buffer planting along Highway N to the east.

6. That the APPLICANT install a "Right-Out Only" sign at the facility exit onto NW Tiffany Park Road.

On January 20, 2022, Appellants appealed the Planning Commission's decision to the BZA. Another staff report was prepared for the BZA, in which staff outlined highlights from the site plan and discussed some of the changes CKC made to its plan:

> CKC . . . has made the following alterations to the plan in order to buffer the facility and to mitigate potential impacts on adjoining landowners. The entire facility has been shifted to the eastern 15.28 acres of the 30.14 acre property. The western 14.86 acres would remain open pasture area. A 40 ft. wide Landscape Buffer containing a mixture of coniferous and deciduous trees would be located along the western border of the property adjacent to a bordering single-family dwelling and a 30 ft. Landscape Buffer containing deciduous street trees would be located along Highway N. A 30 ft. wide Landscape Buffer containing deciduous street tress would be located along NW Tiffany Park Road. The Site Plan contains a note stating storage within the covered outdoor parking areas and uncovered parking/outside storage areas will be limited to RV's, boats, trailers and other vehicles. The Site Plan contains a note stating "Gate Hours of Operation for customers are: Monday – Sunday 6 am – 11 pm". The Site Plan contains a note concerning the lighting which states "Outdoor lighting will be LED Wall Packs. Lights will

5

be projected downward on exterior buildings." The Site Plan indicates 6 ft. solid vinyl fencing would be installed around the perimeter of the facility in the area of the office and climate controlled self-storage building, which is near the entrance to the facility off of NW Tiffany Park Road. The fencing would transition to 6 ft. black vinyl coated chain link with black screening mesh for the remaining perimeter of the facility. CKC . . . is also required to perform a ½ street road improvement consisting of widening NW Tiffany Park Road to 24 feet and adding a 4 inch asphalt overlay to the road along the property frontage.

As with the previous staff report, staff did not make a recommendation to the BZA.

A hearing before the BZA was held on May 4, 2022. The record before the Planning Commission was included in the record before the BZA. At the beginning of the hearing, the Assistant Director of Planning and Zoning discussed the 2021 application and the changes made to it compared to the previous applications. Both the Assistant Director and the Director of Planning and Zoning stated the site plan meets all of the requirements.[4] The opponents to the SUP testified about their concerns, and CKC presented evidence in support of its application. As part of CKC's evidence, testimony was offered by the civil engineer on the project, who discussed the changes that were made to the facility to provide buffering and screening for neighboring landowners, as well as the roadway improvements made and the low level of traffic that would be generated by the facility.

Later during the hearing, CKC agreed to modify the facility's hours of operation to 7:00 am to 10:00 pm, and also agreed to change the fence height to eight feet. Following the close of evidence, the BZA voted two-to-two against

---

[4] Notably, the staff reports on the previous 2017 and early 2021 applications had recommended approval of said applications.

reversing the Planning Commission's decision, thereby denying Appellants' appeal and approving the SUP. In its judgment, the BZA found the SUP meets the standards outlined in section 400.760.D of the Zoning Order, and concluded that the proposed special use "will conform to the applicable requirements, regulations and standards of the Platte County Zoning Order of 1990, as amended, including but not limited to, the standards set forth in Article III, Section 400.390 and Article VIII, Section 400.760, Subsection D."

Appellants subsequently filed a petition for a writ of certiorari in the trial court, challenging the BZA's approval of the SUP. After hearing arguments from the parties, the trial court affirmed the decision of the BZA in a judgment filed on February 28, 2023.

Appellants appeal. Additional facts will be provided below, as necessary.

## Standard of Review

On appeal, we "review[] the findings and conclusions of the BZA and not the judgment of the trial court." *Antioch Cmty. Church v. Bd. of Zoning Adjustment of City of Kan. City*, 543 S.W.3d 28, 33 (Mo. banc 2018) (quoting *State ex rel. Teefey v. Bd. of Zoning Adjustment of Kan. City*, 24 S.W.3d 681, 684 (Mo. banc 2000)). Article V, section 18 of the Missouri Constitution governs the scope of our review of an agency decision, which "shall include the determination whether the [decision is] authorized by law, and in cases in which a hearing is required by law, whether the [decision is] supported by competent and substantial evidence upon

7

the whole record." *Id.* at 33-34 (alterations in original) (quoting MO. CONST. art. V, § 18).

Whether the BZA's decision is authorized by law is a legal question we determine *de novo. Id.* at 34. "'Substantial evidence is defined as "competent evidence which, if believed, would have probative force upon the issues."'" *State ex rel. Karsch v. Camden Cnty.*, 302 S.W.3d 754, 756 n.1 (Mo. App. S.D. 2010) (quoting *Windy Point Partners, L.L.C. v. Boone Cnty. Comm'n.*, 100 S.W.3d 821, 825 (Mo. App. W.D. 2003)). "Determining whether the decision is supported by competent and substantial evidence 'does not mean that the reviewing court may substitute its own judgment on the evidence for that of the administrative tribunal.'" *Antioch Cmty. Church*, 543 S.W.3d at 34 (quoting *Mann v. Mann*, 239 S.W.2d 543, 544 (Mo. App. 1951)). "Instead, we must view the evidence and reasonable inferences in the light most favorable to the zoning board." *Lynch v. Franklin Cnty.*, 604 S.W.3d 855, 862 (Mo. App. E.D. 2020) (citing *Karsch*, 302 S.W.3d at 756). Consequently, "'[i]f the evidence would support either of two different, opposed findings, this Court is bound by the determination of the [zoning board].'" *Id.* (second alteration in original) (quoting *Karsch*, 302 S.W.3d at 756).

## Analysis[5]

---

[5] Appellants' points are multifarious, as they both state multiple grounds for reversal. "A multifarious point on appeal preserves nothing for appellate review." *Crisp v. Mo. Sch. for Deaf, Dep't of Elementary & Secondary Educ.*, 681 S.W.3d 650, 659 (Mo. App. W.D. 2023) (citation omitted). Nevertheless, "[w]e do have discretion to review non-compliant briefs *ex gratia* when the argument is 'readily understandable.'" *Int. of S.M.W.*, 658 S.W.3d 202, 212-13 (Mo. App. W.D. 2022) (quoting *Ebert v. Ebert*, 627 S.W.3d 571, 585 (Mo. App. E.D. 2021)) (other citation omitted). This is preferable where,

Appellants set forth two points on appeal. In their first point, Appellants assert the BZA erred in granting the SUP because the proposed special use is contrary to law and unsupported by competent evidence, in that it does not meet certain, applicable standards under the Zoning Order. In their second point, Appellants similarly claim the BZA erred in granting the SUP because the proposed special use is contrary to law, in that it is barred by the doctrines of *res judicata*, collateral estoppel, and the law of the case.

Before addressing these points, it is necessary to briefly explain the nature of a SUP. "Special use permits sanction a land use explicitly authorized in a designated zone by ordinance." *Ode v. Bd. of Zoning Adjustment of Platte Cnty.*, 796 S.W.2d 81, 83 (Mo. App. W.D. 1990) (citation omitted). They "allow a land use authorized by the local legislative body and deemed conducive to the welfare of the community but which 'may be incompatible with the basic uses in the particular location in relation to surrounding properties, unless certain conditions are met.'" *Id.* (quoting *Deffenbaugh Indus., Inc. v. Potts*, 802 S.W.2d 520, 529 (Mo. App. W.D. 1990)). "[I]n short, a special exception is one allowable [by special use permit] when the facts and conditions specified in the ordinance as those upon which the exception is permitted are found to exist." *Id.* (second alteration in original) (quoting *Potts*, 802 S.W.2d 529).

---

as here, "we are able to decipher the argument being made by the appellant without becoming an advocate for the appellant[.]" *State v. Clark*, 503 S.W.3d 235, 237 (Mo. App. W.D. 2016). We therefore exercise our discretion to review Appellants' points to the extent we are able to understand them.

We now turn to Appellants' points.

## A. Point I

In claiming it was error for the BZA to grant the SUP, Appellants' first point on appeal asserts the proposed special use is contrary to law and unsupported by competent evidence "in that it does not meet, nor purport to meet, the applicable standards under the [Zoning Order], including Minimum Infrastructure Standards and Standards for High Intensity Retail/Commercial zoned properties." Appellants specifically claim there is no evidence supporting that certain requirements for this special use have been met, namely that "(1) The SUP contains adequate access roads; (2) The SUP meets the wastewater requirements of the Zoning Order; (3) The SUP meets the water requirements of the Zoning Order; or (4) The property is suitable for High Intensity Retail/Commercial Use[.]"

"The logical starting point is to first determine whether the BZA correctly applied the [Zoning Order] . . . ." *Four B. Corp. v. City of Harrisonville*, 667 S.W.3d 169, 174 (Mo. App. W.D. 2023). This necessarily requires us to interpret the provisions of the Zoning Order. "This Court interprets ordinances using 'the same general rules of construction as are applicable to the statutes of the state.'" *Antioch Cmty. Church*, 543 S.W.3d at 35 (quoting *Fleming v. Moore Bros. Realty Co.*, 251 S.W.2d 8, 15 (Mo. 1952)). "The 'primary rule of statutory interpretation is to give effect to legislative intent as reflected in the plain language of the statute at issue.'" *Four B. Corp.*, 667 S.W.3d at 175 (quoting *State ex rel. Vandenboom v. Bd. of Zoning Adjustment of City of Kan. City*, 633 S.W.3d 446, 456 (Mo. App. W.D.

10

2021)). Indeed, such intention "must be ascertained by giving . . . word[s] [their] ordinary, plain and natural meaning, by considering the entire act and its purposes and by seeking to avoid an unjust, absurd, unreasonable or oppressive result[.]" *St. Louis Cnty. v. Taggert*, 866 S.W.2d 181, 182 (Mo. App. E.D. 1993) (quoting *Cunningham v. Bd. of Alderman of Overland*, 691 S.W.2d 464, 467 (Mo. App. E.D. 1985)).

"We resort 'to other rules of statutory interpretation only when the plain meaning of the statute is ambiguous or defeats the purpose of the statute.'" *Four B. Corp.*, 667 S.W.3d at 175 (quoting *Vandenboom*, 633 S.W.3d at 456). "Where a term in a zoning ordinance is susceptible of more than one interpretation, the courts are to give weight to the interpretation that, while still within the confines of the term, is least restrictive upon the rights of the property owner to use his land as he wishes[.]" *Taggert*, 866 S.W.3d at 182 (quoting *Cunningham*, 691 S.W.2d at 468). "[N]o portion of [the zoning ordinance] is read in isolation, but rather is read in context to the entire statute, harmonizing all provisions." *Antioch Cmty. Church*, 543 S.W.3d at 35 (quoting *Aquila Foreign Qualifications Corp. v. Dir. of Revenue*, 362 S.W.3d 1, 4 (Mo. banc 2012)).

Section 400.260 of the Zoning Order pertains to the CH, or Highway Commercial, district. Section 400.260.A describes a CH district as "intended for the conduct of personal and business services and the general retail business of the area." Section 400.260.B identifies low and medium intensity uses "permitted as a matter of right" in CH districts.

Of importance to our review, section 400.260.C identifies "Special Uses" that "may be approved by the Planning Commission in accordance with the provisions of Article VIII, Section 400.760" in CH districts. These uses are considered "High Intensity Highway Retail/Commercial" due to the following:

> These retail uses are characterized by the highest levels of light, noise and traffic acceptable for a 'CH' Highway Commercial District. These uses may have hours of operation twenty-four (24) hours a day and seven (7) days a week. High intensity retail is intended for areas that contain very limited, well-buffered residential uses and existing commercial uses.

Section 400.260.C.1. Self-storage facilities are specifically listed among the various uses described as "High Intensity Retail/Commercial", which also include cemeteries, auto washes, adult entertainment businesses, "Big Box retail" department stores, and single-family residences which sit on twenty or more acres, among many others. Section 400.260.C.2.

As indicated in section 400.260.C, approval of a SUP in a CH district is governed by section 400.760 of the Zoning Order. This section authorizes the Planning Commission

> to issue special use permits for those uses described as 'Special Uses' in the specific district regulations. Property owners are not entitled to conduct such special uses as a matter of right, but only upon issuance of a special use permit by the Planning Commission after public hearing as an exception to the general provisions of the Zoning Order.

Section 400.760.A. Subsection D lists the specific standards that must be met for a SUP to be granted:

> A special use permit *shall not be granted* unless specific written findings of fact, directly based upon the particular evidence presented, support the following conclusions:

12

1. The proposed special use complies with all applicable provisions of this Order, including use regulations, height and area regulations, parking regulations and building requirements.

2. The proposed special use at the specific location will not adversely affect the welfare or convenience of the public.

3. The proposed special use will not cause substantial injury to the value of property in the neighborhood in which it is to be located.

4. The location and size of the special use, the nature and intensity of the operation involved in or conducted in connection with it and the location of the site with respect to the streets giving access to it are such that the special use will not dominate the immediate neighborhood so as to prevent development and use of neighboring property in accordance with the applicable zoning district regulations. In determining whether the special use will so dominate the immediate neighborhood, consideration shall be given to the location, nature and height of the buildings, structures, walls and fences on the site and the nature and extent of landscaping and screening on the site.

5. Off-street parking and loading areas will be provided in accordance with the standards set forth in this Order. Parking and loading areas will be screened from adjoining residential uses and be located to protect the adjoining residential uses from any injurious effect.

6. Adequate access roads or entrance and exit drives will be provided and shall be designed to prevent traffic hazards and minimize traffic congestion in public streets and alleys.

7. Adequate utility, drainage and other necessary improvements and facilities have been or will be provided.

8. The proposed special use shall be subject to the regulations outlined in the Platte County Subdivision Regulations of 1992, as amended, Article IV, Section 405.175.

Section 400.760.D (emphasis added).[6]  Notably, section 400.760 also gives the

Planning Commission the authority to add conditions or restrictions to a special

use in order for the use to comply with these standards:

> Prior to the granting of any special permit use, the Planning Commission may recommend and stipulate such conditions and restrictions upon the establishment, location, construction, maintenance, operation, architectural design and aesthetics of the special use as are deemed necessary for the protection of the public interest and to secure compliance with the standards and requirements specified in Subsection (D).

Section 400.760.E.

In short, in order for CKC to obtain a section 400.260.C special use permit

for a self-storage facility in a CH district, such special use must be "approved by

the Planning Commission in accordance with . . . Section 400.760[.]"  Section

400.260.C.  Specifically, at a hearing, CKC must present evidence by which the

Planning Commission may find that the section 400.760.D standards have been

met.  After such evidence is presented and prior to granting CKC a SUP, the

Planning Commission may "recommend and stipulate" conditions and restrictions

upon such SUP as such Commission deems necessary.  Section 400.760.E.

Appellants' first point, however, does *not* assert that section 400.760.D's

standards were not met here by the proposed special use.  Rather, Appellants'

argument rests on their assertion that a completely different set of standards,

located in section 400.390 of the Zoning Order, have not been satisfied.  Section

400.390 comprise the "Minimum Existing Infrastructure Standards" for purposes

_____

[6] The BZA's specific findings of facts in this case closely mirrored this language.

14

of "ensur[ing] that the existing infrastructure surrounding a proposed Development meets certain minimum standards necessary to support said Development." Section 400.390.A.2. Section 400.390 seeks to "establish the minimum standards necessary for existing infrastructure to support the impact of a proposed Development[,]" section 400.390.A.3, specifically by outlining "the required minimum infrastructure" in the categories of external roads, fire stations, wastewater, and water for each zoning district. Section 400.390.E. "Development," as used in section 400.390, includes "seeking a special use permit[.]" Section 400.390.B. Section 400.390.C goes on to state:

> This Section *shall* apply to all proposed Development within the unincorporated area of Platte County, Missouri. Applications for a Rezoning, Preliminary Plat, *Special Use Permit* or Site Development Plan *may* be denied by the Planning and Zoning Commission if it determines that the minimum infrastructure necessary to support the proposed Development *is not present.*

(Emphasis added). Section 400.390.A.3 similarly states that if the applicable minimum standards are not met, an application request *may* be denied:

> This Section gives the County the *authority* to deny an application request if these minimum standards are not met. It is not the intent of this Section to supersede or replace the infrastructure standards and specifications outlined in Article IV of the Platte County Subdivision Regulations, other standards and specifications which may exist elsewhere in the County's Codes, or standards and specification adopted by an applicable entity (i.e. road district, sewer district, water district, etc.), as those standards and specifications primarily relate to new infrastructure.

*Id.* (emphasis added).

Appellants contend that the SUP here did not satisfy section 400.390's "required minimum infrastructure" for the CH district in relation to external roads,

15

wastewater, and water. As to external roads, in relevant part, the following minimum requirements apply to CH districts:

> Direct access to a secondary or primary arterial road or to a collector road that meets all of the minimum County street standards for a collector road. Major off-site roadway segments within the Primary Impact Area must meet the following minimum criteria:
>
> . . .
>
>> b. Minimum driving surface width of 24 feet including over all bridges and culverts.
>>
>> c. Stopping sight distances at every point along the roadway segment shall meet AASHTO's minimum design values. The speed limit of a roadway segment cannot be reduced solely to meet stopping sight distance requirements unless a speed study is conducted by the applicant and approved by the County Engineer.

Section 400.390.F.4.[7]

Concerning the applicable minimum requirements for wastewater collection and treatment, section 400.390.H.2 provides, in pertinent part:

---

[7] The "Primary Impact Area" is defined by section 400.390.B as "[t]he Area of Traffic Impact Study as defined by Article I, Section 405.175 of the Platte County Subdivision Regulations." Section 405.175 of the Platte County Subdivision Regulations concerns "Traffic Impact Study Requirements." "A Traffic Impact Study (TIS) shall be performed in conjunction with a . . . Special Use Permit . . . for proposed developments generating 100 vehicles during the peak hour or 1,000 additional vehicles per day based upon estimations using the latest edition of the Institute of Transportation Engineers' (ITE) Trip Generation." Section 405.175.A, Platte County Subdivision Regulations. Subsection D of section 405.175 of the Platte County Subdivision Regulations governs the "Area of Traffic Impact Study," and states that "[t]he study area shall be based on the amount of estimated traffic that is generated." For our purposes, section 405.175.D of the Platte County Subdivision Regulations indicates that the Primary Impact Area is one-half mile measured from the boundary of the subject property when the amount of new daily trips generated is less than 1,500. However, that section also states that "the exact size of the impact area will be defined by the Director of Planning and Zoning based on the traffic generation characteristics, existing roadway characteristics, land use characteristics and other related County concerns." *Id.*

16

Wastewater collection and treatment shall be provided by a centralized sanitary sewer system operated by a Continuing Authority, with the following exceptions:

. . .

> b. Decentralized treatment facilities[8] are acceptable for proposed non-residential uses that are determined by the Planning and Zoning Commission to be of such a nature that the use must be located in areas which do not have a centralized sanitary sewer system. Said treatment facilities may be operated by the applicant and not a Continuing Authority. Examples include, but are not limited to, recreation facilities, power plants and other uses that generate significant waste but do not typically locate in areas that have a centralized sanitary sewer system.

And, with respect to water, section 400.390.I.3 requires the following as the applicable minimum requirements for a CH district:

> Potable water shall be provided to the site from a central public or special district water source. Sufficient water supply shall be available or provided to meet the fire protection water flow rate and volume for a commercial structure(s) as defined by the adopted County Building Code.

In order to resolve Appellants' first point arguments, we must first settle a critical disagreement between the parties: whether section 400.390's minimum infrastructure requirements *in their entirety* must be met for a SUP to be granted by the BZA. Appellants' argue in the affirmative, claiming that section 400.760.D's standards implicitly refer to section 400.390's minimum infrastructure requirements, particularly concerning the standards for "adequate access roads," "adequate utility," and "drainage." As such, Appellants essentially argue that for

---

8 Section 400.390.B defines a "decentralized sanitary sewer system" as "[o]nsite and/or cluster wastewater systems used to treat and disperse or discharge small volumes of wastewater. Types of decentralized sanitary sewer systems include, but are not limited to, individual onsite septic systems, small lagoons, recirculating sand filters and package plants."

17

the SUP to satisfy the requisite standards under section 400.760.D pertaining to "adequate" access roads, utility, and drainage, the SUP must meet the minimum infrastructure requirements detailed in section 400.390 for external roads, wastewater, and water. Stated differently, according to Appellants, a special use must, at the very least, meet the section 400.390 minimum infrastructure requirements in order for it to be "adequate" under section 400.760.D. Appellants assert that to hold otherwise would rewrite the mandatory language throughout section 400.390 and would render it a meaningless provision.

Respondents do not read section 400.390 as placing a mandatory duty on the BZA to deny a SUP if the minimum infrastructure requirements are not met. Instead, they interpret section 400.390 as simply providing the BZA the authority to do so at its discretion. Consequently, Respondents read section 400.390 as giving the BZA the authority to approve a SUP even if it does *not* satisfy all the applicable minimum existing infrastructure standards provided therein. Respondents point to two provisions within section 400.390 to support their position, specifically that portion of section 400.390.A.3 "giv[ing] the County the *authority* to deny an application request if these minimum standards are not met[,]" as well as section 400.390.C's pronouncement that "[a]pplications for a . . . Special Use Permit . . . *may* be denied by the Planning and Zoning Commission if it determines that the minimum infrastructure necessary to support the proposed Development is not present." (Emphasis added).

18

CKC argues in its brief that this reading of section 400.390 does not "rewrite" it or render it "meaningless" as Appellants contend, but instead "simply recognizes that the Commission has wide discretion to grant special use permits and to approve other developments, and that it may do so where the proposed use does not meet all the minimum existing infrastructure standards set out in § 400.390." The BZA similarly explains in its own brief that "[t]he Board had the right to adopt the 'minimum infrastructure' standard if they wished; by the same token, they had the right to deny its applicability if they didn't see it as necessary to the granting of the special use permit in this matter."

We agree with Respondents. The BZA had the discretionary authority to grant CKC the requested SUP, regardless of whether the proposed special use met all the minimum infrastructure requirements of section 400.390. To hold otherwise would produce an absurd and unreasonable result. Were we to follow Appellants' reading of section 400.390 to its logical end, *every* special use permitted in a CH district would have to meet *all* of the applicable minimum infrastructure requirements, regardless of the character or type of special use. Such an interpretation cannot stand, as it rests upon the faulty premise that *every* special use requires the *exact same* minimum infrastructure in order to be adequately supported. This faulty premise is evident in examining the various special uses that can be approved in a CH district, all of which have little in common.

19

By way of example, under Appellants' premise, a cemetery, single home on twenty acres, and a "Big Box" department store, all of which are special uses pursuant to section 400.260.C, would have the same minimum requirement for potable water "to meet the fire protection water flow rate and volume *for a commercial structure*(s) as defined by the [Platte] County Building Code." Section 400.390.I.3 (emphasis added); *see* section 400.390.E (chart identifying the CH district with Category 3 for the minimum infrastructure for water, the specifics of which are found in section 400.390.I.3). As can be seen from this comparison, not all special uses require the same level of infrastructure in order to be adequately supported; some special uses such as the "Big Box" department store may require more than the minimum infrastructure section 400.390 prescribes, while others like a single home on twenty acres may require less, and perhaps some such as a cemetery require no infrastructure of a particular type at all. Indeed, the very nature of a "special use" is that it departs from the normal collections of use which are, in general terms, similarly situated, such as single-family residential, manufacturing, or commercial business. This makes section 400.760.D's requirement that a special use merely have "*adequate*" access roads, utility, and drainage, readily understandable. As explained by way of example above, what may be "adequate" for one special use may not be "adequate" for another. Accordingly, there must be consideration given as to what is adequate for a *particular* special use, rather than simply requiring all of section 400.390's prescribed minimum infrastructure for all special uses as Appellant suggests.

20

Further supporting this result is the plain language of the Zoning Order. Section 400.390.C states that "[a]pplications for a . . . Special Use Permit . . . *may be denied* by the Planning and Zoning Commission if it determines that the minimum infrastructure necessary to support the proposed Development *is not present*."[9] (Emphasis added). Section 400.090.B defines the word "may" as "*permissive*."[10] (Emphasis added). Accordingly, had the County intended that a SUP be mandatorily denied if it did not meet section 400.390's minimum infrastructure requirements, the word "shall" would have been used instead of "may" in this portion of section 400.390.C.[11] Similarly, section 400.390.A.3 simply provides "the County the *authority* to deny an application request" if the minimum standards therein are not met. (Emphasis added). "Authority" is not defined in the Zoning Order so we give it its plain and ordinary meaning,[12] which is "[p]ower

---

[9] We note that section 400.390 and its standards undoubtedly apply to a proposed SUP: "This Section shall apply to all proposed Development[, which includes seeking a SUP, in Platte County]." Section 400.390.C. "Shall" is defined in section 400.090.B as "mandatory." While at first blush it would appear "[t]he use of 'shall' in these circumstances excludes any idea of discretion[,]" *Waeckerle v. Bd. of Zoning Adjustment*, 525 S.W.2d 351, 358 (Mo. App. 1975), and thus these minimum infrastructure requirements apply to a proposed SUP, nowhere within section 400.390 is the BZA required to deny a SUP if the proposed special use does not satisfy them; rather, as discussed, the BZA has discretion in doing so.

[10] No conflicting definitions for these terms are provided in section 400.390. *Cf.* section 400.390.B ("In the event of a conflict between terms defined in Article I, Section 400.090 and the terms defined herein, this Section 400.390 shall control.").

[11] This is particularly evident considering the sentence *directly proceeding* this one uses the word "shall": "This Section *shall* apply to all proposed Development within the unincorporated area of Platte County, Missouri." Section 400.390.C (emphasis added). Then, "[a]pplications for a . . . [SUP] . . . *may* be denied by the [BZA] if it determines if it determines that the minimum infrastructure necessary to support the proposed Development is not present." *Id.* (emphasis added).

[12] Section 400.390.B states, "Where terms are not defined, they shall have their ordinary accepted meanings within the context with which they are used."

21

or right to give orders, make decisions[.]"  *Authority*, Oxford English Dictionary,

https://www.oed.com/search/dictionary/?scope=Entries&q=authority (last visited Mar. 27, 2024).  Again, had the County desired a SUP be denied in every situation in which it did not meet section 400.390's minimum standards, it could have used the word "shall" in section 400.390.A.3.  *See Waeckerle v. Bd. of Zoning Adjustment*, 525 S.W.2d 351, 358 (Mo. App. 1975) ("The use of 'shall' in these circumstances excludes any idea of discretion[.]").

The same can be said regarding the language of section 400.760.D, which governs what must be determined by the BZA in order for a SUP to be granted. *Nowhere* within those standards is section 400.390 mentioned, let alone its minimum infrastructure requirements.  If the satisfaction of section 400.390's minimum infrastructure requirements was an intended requirement for the granting of every SUP, the County would have explicitly said so in section 400.760.D.  And, while section 400.760.D.1 requires that a "proposed special use compl[y] with all applicable provisions of this Order," one would simply be directed back to section 400.390's clear statement that a SUP "may" (i.e., not "shall") be denied if it does not meet the minimum infrastructure requirements. Accordingly, reading the language of these provisions in harmony with each other, as we must, it is clear that the denial of a SUP because it does not meet the minimum standards in section 400.390 is merely permissible.  And, conversely then, the grant of a SUP despite a lack of compliance with these minimum

22

standards is also permissible. This leads to the logical conclusion that a SUP may be granted in situations where the BZA applies the minimum infrastructure requirements to a proposed special use and ultimately determines the satisfaction of the requirements is unnecessary for said use to be supported. Importantly, if this determination is supported by the evidence (which we are to view in the light most favorable to the BZA), then we are bound by it, even if a different, opposed finding is also supported. *See Lynch*, 604 S.W.3d at 862.

Having settled this initial question, we may address Appellants' claim that there was not substantial and competent evidence to support the BZA's decision to uphold the Planning Commission's grant of the SUP. We hold there is.

Initially, we note that substantial evidence at the BZA hearing demonstrated the efforts CKC undertook to address previous concerns with the proposed special use and its potential impact on the surrounding area. The location of the self-storage facility was shifted to the eastern side of the property, leaving fourteen acres of open space between the facility and property owners to the west. This shift also placed the facility below and to the east of a ridge line running north and south, thereby concealing the majority of the facility from the view of the western homeowners. Further buffering was provided through additional landscaping located on the western edge of the property, and CKC agreed to raise the fence surrounding the perimeter of the facility to eight feet.

Further concessions were made by CKC to the facility itself. The number of buildings was reduced, as well as the square footage for outside storage.

23

Anticipated wastewater was reduced to just one source, the office bathroom, which would be treated on-site.[13]  And, to address storm water issues, the site plan incorporated a detention basin to collect surface water runoff from the facility, something CKC included on its own initiative.  Outdoor covered and uncovered parking areas were also moved such that the storage buildings shield them from public view.

In addition to the increased fence height, other conditions and improvements to the self-storage facility have been agreed to by CKC.  These include changing the hours of the facility's operation, adding a "right out only" sign to direct traffic exiting the facility towards Highway N, widening NW Tiffany Park Road to twenty-four feet, dedicating a right-of-way along NW Tiffany Park Road, performing a half-street road improvement and adding a four-inch asphalt overlay, and completing on-site grading along Highway N to improve sight distance.

Appellants, however, overlook these efforts to minimize the facility's impact and choose to focus instead on specific minimum infrastructure requirements they claim have not been met here, specifically those for external roads, wastewater, and water.  Yet, as discussed above, the BZA had the discretion to grant the SUP even if each and every specific minimum infrastructure requirement was not met.  Regardless, Appellants' narrowed arguments are unpersuasive.  Beginning with the latter, Appellants assert the standards for water under section 400.390.I.3

---

[13] The facility had previously contemplated wastewater from RV's along with wastewater from the office bathroom.

have not been satisfied, in that there is no evidence that the water flow rate and volume will meet the demands for a commercial structure. This argument is incorrect, however, considering the Platte County Water Supply District signed the SUP application, thereby agreeing it could provide the requested service. Notably, the SUP application stated that "[a] letter from an applicable entity acknowledging their ability to provide service or comply with guidelines or regulations *may be substituted for a signature*." (Emphasis added). By signing the SUP application, the Water District was agreeing it could provide water in compliance with all applicable guidelines or regulations, which presumably includes those for necessary water flow rate and volume. Accordingly, substantial and competent evidence supports that the SUP will meet the applicable water flow needs.

Concerning the standards for wastewater pursuant to section 400.390.H.2, Appellants claim they are unsatisfied because the self-storage facility does not have a centralized sanitary sewer system. They also claim that a decentralized treatment facility would be unacceptable due to the lack of evidence that the facility must be located in an area which does not have a centralized sanitary sewer system. While true the proposed self-storage facility does not have a centralized sanitary sewer system, there is substantial and competence evidence in the record to support that the exception of a decentralized treatment facility applies here. As discussed above, the only source of wastewater from the self-storage facility will originate from a single bathroom in the facility's office. The BZA could have reasonably believed that this level of waste required only a decentralized treatment system,

such as a septic system, rather than a centralized treatment system. The Platte County Health Department indicated as much, having signed off on the SUP application and stated "it is not opposed to the Special Use Permit – Site Development Plan submitted by [CKC]." We therefore are unpersuaded by Appellants' argument regarding wastewater.

Appellants' last argument concerning the minimum infrastructure requirements concerns the standards for external roads under section 400.390.F.4. In arguing that these standards have not been met, Appellants assert the evidence demonstrates there is no direct access to an arterial or collector road, namely Highway N; a road within the Primary Impact Area, again Highway N, does not have a driving surface width of twenty-four feet, and; stopping sight distances are deficient. Even if we were to agree that these three requirements were not satisfied here, there is still substantial and competent evidence supporting the BZA's approval of the SUP.

This is clear when examining the evidence concerning the level of traffic the self-storage facility will generate. The civil engineer on the project testified at the BZA hearing that at full development, the facility will generate only eighteen vehicles at peak hour and 136 vehicles over the course of a day, which would consist of cars and some RVs. This level of traffic is not enough to require a Traffic Impact Study under section 405.175.A of the Platte County Subdivision Regulations. In fact, eighteen vehicles is not even close to the minimum 100 vehicles that must be generated at peak hour for a Traffic Impact Study to be required. The same is true

for the 136 vehicles per day compared to the 1,000 vehicles per day that must be generated to require the Study. This could have led the BZA to the reasonable belief that section 400.390.F.4's requirements for external roads within the Primary Impact Area were not necessary for the support of the self-storage facility, or that the Primary Impact Area would have been so small that satisfaction of these requirements was not necessary.[14]  *See* section 405.175.D, Platte County Subdivision Regulations ("[T]he exact size of the impact area will be defined by the Director of Planning and Zoning based on the traffic generation characteristics, existing roadway characteristics, land use characteristics and other related County concerns.").

Adding to this consideration are the conditions and roadway improvements CKC agreed to make in order to address the various roadway concerns. For example, the access point to the self-storage facility was moved to a high point on NW Tiffany Park Road to improve sight lines when leaving the site. Additionally, a "right out only" sign was conditioned so that traffic exiting the facility will be directed towards Highway N, and on-site grading along Highway N was agreed to be completed in order to improve sight distance. These improvements were all in addition to CKC's prior agreement to widen NW Tiffany Park Road to twenty-four feet, dedicate a right-of-way along NW Tiffany Park Road, perform a half-street

---

[14] This is especially true considering the Director of Planning and Zoning, who determines the exact size of the impact area pursuant to section 405.175.D of the Platte County Subdivision Regulations, stated to the BZA that if the site plan was approved, "we're comfortable that it meets all the requirements . . . ."

road improvement and add a four-inch asphalt overlay. This, in addition to the evidence of the small amount of traffic that will be generated by the self-storage facility, could lead the BZA to have reasonably concluded that CKC's efforts and willingness to make these improvements to address roadway concerns was sufficient for the SUP to be supported. As such, we are unpersuaded by Appellants' arguments concerning the minimum infrastructure requirements.

Appellants make one last argument in their first point, arguing that the proposed area for the self-storage facility does not fit the type of area intended for High Intensity Retail/Commercial uses as stated in section 400.260.C.1. They refer specifically to the following language in section 400.260.C.1: "High intensity retail is intended for areas that contain very limited, well-buffered residential uses and existing commercial uses." Appellants claim that due to the lack of existing commercial uses in the surrounding area, the self-storage facility does not fit the surrounding area as defined by the Zoning Order, and is thus contrary to law and unsupported by competent evidence. We disagree.

Importantly, section 400.260.C.1 states this type of retail is simply "intended" for areas that have existing commercial uses. "Intended" is not defined in the Zoning Order, and its plain meaning is not synonymous with the area being "required" to have existing commercial uses. As such, it is not an "automatic violation" of the Zoning Order if a SUP for a CH special use is granted in an area that contains no existing commercial uses.

Additionally, the evidence demonstrates that the self-storage facility does fit within the surrounding area, even if there are no existing commercial uses. Notably, the property is bordered on the north and east by land *zoned CH*. Industrial and public service uses are also in the immediate area, just south across NW Tiffany Park Road. This leaves the residential dwellings and land zoned for residential purposes west of the property as the only neighboring land which does not have a similar purpose to that granted to CKC. However, pursuant to the SUP these residential-use properties are "very limited" and "well-buffered" from the self-storage facility, pursuant to section 400.260.C.1. Indeed, as previously discussed, extensive considerations were made to shield the residential-use properties from the facility, including open space between the facility and the landowners, landscaping on the western edge of the Property, and placing the facility below a ridge line shielding it from western view and minimizing the effect of the facility's lighting, which was already contemplated as downward-facing. Accordingly, even if existing commercial uses are not in the area surrounding the self-storage facility, competent and substantial evidence supports that the proposed area for the facility is suitable for a High Intensity Retail/Commercial use.[15] "'If the evidence would support either of two different, opposed findings, this Court is bound by the determination of the [zoning board].'" *Lynch*, 604 S.W.3d at 862 (alteration in original) (quoting *Karsch*, 302 S.W.3d at 756).

---

[15] Notably, a local resident testified at the BZA hearing that "there is a need" for a self-storage facility in the area. There was also testimony that property values, including those for residences, have actually increased.

There is substantial and competent evidence to support the BZA's grant of the SUP. Appellants' first point is denied.

## B. Point II

Appellants' second point on appeal asserts it was error for the BZA to grant the SUP because the proposed special use is contrary to law "in that it is barred by the doctrines of *res judicata*, collateral estoppel, and the law of the case because the facts providing grounds for denial of CKC's original application for SUP in 2017, which were upheld by both the Circuit Court and this Court, have not changed." We address each doctrine in turn.

### *Res Judicata*

Appellants first argue that the proposed special use is barred by *res judicata*, in that the facts dispositive to whether the SUP should be granted have not changed between CKC's 2017 application and the current application. Specifically, Appellants assert the subject property still does not comply with the mandatory infrastructure requirements concerning external roads, site distances, and wastewater treatment, which is what led to the denial of CKC's 2017 application for a SUP. Accordingly, Appellants claim "those issues were or could have been adjudicated and are thus precluded now as a matter of law."

"The common-law doctrine of *res judicata* precludes relitigation of a claim formerly made." *Chesterfield Vill., Inc. v. City of Chesterfield*, 64 S.W.3d 315, 318 (Mo. banc 2002) (citations omitted). "*Res judicata*, or its modern term, claim preclusion, prohibits 'splitting' a claim or cause of action." *Id.* (citation omitted).

30

"A claim is '[t]he aggregate of operative facts giving rise to a right enforceable by a court.'[] The definition of a cause of action is nearly the same: 'a group of operative facts giving rise to one or more bases for suing.'" *Id.* (alteration in original) (footnote omitted) (quoting BLACK'S LAW DICTIONARY (7th ed. 1999)). "The doctrine precludes not only those issues on which the court in the former case was required to pronounce judgment, 'but to every point properly belonging to the subject matter of litigation and which the parties, exercising reasonable diligence, might have brought forward at the time.'" *Id.* (quoting *King Gen. Contractors, Inc. v. Reorganized Church of Jesus Christ of Latter Day Saints*, 821 S.W.2d 495, 501 (Mo. banc 1991)). Therefore, "[t]o determine whether a claim is barred by a former judgment, the question is whether the claim arises out of the same 'act, contract or transaction.'" *Id.* at 318-19 (quoting *Grue v. Hensley*, 210 S.W.2d 7, 10 (Mo. 1948); *King Gen. Contractors, Inc.*, 821 S.W.2d at 501).

To do so, we look to the factual bases for the claims. *Id.* at 319. "Claim preclusion 'prevents reassertion of the same claim even though additional or different evidence or legal theories might be advanced to support it.'" *Id.* at 320 (quoting Fleming James Jr., Geoffrey C. Hazard, Jr. & John Leubsdorf, *Civil Procedure*, § 11.8, p. 684 (5th ed. 2001)). There must be "new ultimate facts, as opposed to evidentiary details, that form a new claim for relief." *Id.* (citation omitted). Indeed, *res judicata* "'extends only to the facts in issue as they existed at the time the judgment was rendered, and *does not* prevent a reexamination of the same questions between the same parties where in the interval the facts have

31

changed or new facts have occurred which may alter the legal rights or relations of litigants.'" *Elam v. City of St. Ann*, 784 S.W.2d 330, 334 (Mo. App. E.D. 1990) (emphasis added) (quoting *City of Hardin v. Norborne Land Drainage Dist.*, 232 S.W.2d 921, 925 (Mo. 1950)).

*Res judicata* does not apply here as the present claim and the 2017 proceedings did not arise out of the same act, contract, or transaction. While the present case and the 2017 proceedings both dealt with applications for SUPs for the same type of use at the same Property, the respective cases were not dealing with the same application. The claim in the previous case was whether a SUP should be granted based on the 2017 application; here, the claim is whether a SUP should be granted based on the 2021 application. And, as Appellants concede and we have exhaustively discussed, the 2021 application is different from the 2017 application, and these differences are evident and significant. As detailed above, changes were made to the location of the self-storage facility on the Property, the size and organization of the actual facility, the buffering and fencing of the facility, the amount of waste, and traffic control, among others. These changes are not merely new evidentiary details, but new ultimate facts, not in existence at the time of previous judgment, and they required a reexamination of whether a SUP for the self-storage facility should be granted.

Indeed, as thoroughly discussed above, the BZA has the discretion to grant a SUP even if the minimum infrastructure requirements are not met when the proposed special use is of such a nature that satisfaction of the infrastructure

requirements are not necessary for its support. The BZA's consideration of whether such satisfaction was necessary here was clearly affected in light of the changes to the scope and impact of the self-storage facility from the 2017 application to the 2021 application. The new ultimate facts thus impacted the nature of the self-storage facility such that a reexamination of whether a SUP should be granted was required based on the merits of the 2021 application.

Consequently, *res judicata* did not apply here to bar the SUP from being granted.[16]

---

[16] Appellants also attempt to compare the present case to *Elam v. City of St. Ann*, 784 S.W.2d 330 (Mo. App. E.D. 1990) in arguing that *res judicata* applies here. In *Elam*, the plaintiffs sought to rezone residentially-zoned lots to commercial. *Id.* at 333. The request was denied and the City brought suit to enjoin the Elams from using their property as an optometry office. *Id.* The trial court dismissed the City's petition, but the Eastern District reversed and remanded, finding the zoning ordinance did not violate the Elams' equal protection rights. *Id.* On remand, the Elams did not challenge the reasonableness of the zoning ordinance on due process grounds nor as a taking, and did not appeal the trial court's judgment in favor of the City. *Id.* Later, the Elams petitioned for a SUP and made a second request for rezoning, both of which were denied by the City. *Id.* In their subsequent declaratory judgment action, the Elams attacked the reasonableness of their property's residential zoning and alleged the zoning was a taking of their property. *Id.*

On appeal, the Eastern District held the reasonableness of the zoning became *res judicata* because "the Elams could have challenged the reasonableness of their property's residential zoning either by an affirmative defense or by a counterclaim for a declaratory judgment." *Id.* at 334. The Elams were thus "precluded from contesting the reasonableness of their property's zoning based exclusively on facts which existed in November, 1985[,]" when the trial court entered judgment for the City on remand in the first action. *Id.* However, the Eastern District did "consider the Elams' current claim on its merits to the extent that facts relevant to the reasonableness of their property's zoning changed between November 1985, the date of the former trial, and the date of the trial below, July, 1988." *Id.*

*Elam* is not applicable here. Unlike the Elams, CKC is not now asserting a claim it could have made, but failed to, when contesting the denial of its 2017 application. Rather, the present case involves the *grant* of a SUP based on a new application with substantially different facts that required consideration on its own merits.

**Collateral Estoppel**

Alternatively, Appellants assert the doctrine of collateral estoppel applies to bar the proposed special use. Similar to their *res judicata* argument, Appellants contend that the issues they raised were previously litigated, in that the facts in the 2017 application that were material to its denial are the same here, specifically those pertaining to the alleged unmet infrastructure requirements and the alleged inappropriateness of a self-storage facility in relation to the surrounding area due to its high level of intensity.

> Collateral estoppel, or issue preclusion, precludes parties from relitigating issues that have already been decided. The doctrine of collateral estoppel applies to preclude relitigation of an issue if four factors are satisfied: (1) the issue decided in the prior adjudication was identical to the issue presented in the present action; (2) the prior adjudication resulted in a judgment on the merits; (3) the party against whom estoppel is asserted was a party or was in privity with a party to the prior adjudication; and (4) the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior suit. Collateral estoppel can be applied only if a final judgment on the merits has been rendered involving the same issue sought to be precluded in the cause in question.

*Orem v. Orem*, 149 S.W.3d 589, 592 (Mo. App. W.D. 2004) (internal citations omitted).

Contrary to Appellants' assertion, the previous adjudication involving the 2017 application did not involve the same issue presented in the present case. First, we note that the previous case reviewed the *denial* of a SUP, whereas here, we are faced with the *grant* of a SUP. Second, the significant changes between the 2017 application and the 2021 application were of such a nature as to affect the scope and impact of the self-storage facility when it came before the BZA in the

34

present action. This in turn naturally affected the BZA's consideration of the case, particularly as to the suitability of the proposed special use within the surrounding area and the need for the minimum infrastructures to be satisfied. As such, the significant differences between the two SUP applications prevent the respective issues in each case from being "identical". The 2021 application had to be considered on its own merits. Consequently, we cannot proceed past the first factor necessary for a successful claim of collateral estoppel, thereby rendering collateral estoppel inapplicable here.

**Law of the Case**

Appellants' last argument in their second point claims the law of the case doctrine bars the proposed special use. As with their other arguments, Appellants argue that "[t]his case and this Court's 2017-2018 case involve substantially the same issues and facts." Appellants assert the facts underlying the determinative issues in the prior case have not changed and cannot now be relitigated, particularly those concerning the "key infrastructure problems" and the character of the surrounding area.

> The doctrine of law of the case provides that a previous holding in a case constitutes the law of the case and precludes relitigation of the issue on remand and subsequent appeal. The doctrine governs successive adjudications involving the same issues and facts. Generally, the decision of a court is the law of the case for all points presented and decided, as well as for matters that arose prior to the first adjudication and might have been raised but were not.

*Walton v. City of Berkeley*, 223 S.W.3d 126, 128-29 (Mo. banc 2007) (internal and other citation omitted) (quoting *State ex rel. Alma Tel. Co. v. Pub. Serv. Comm'n*,

40 S.W.3d 381, 388 (Mo. App. W.D. 2001)).  Importantly, this doctrine "involves relitigation of an issue within the same pending case."  *Id.* at 128.

The law of the case doctrine is inapplicable here.  The present case is simply not the same case as our court previously decided.  There, we affirmed the *denial* of the SUP based on the *2017* application; here, we are presented with the BZA's *grant* of a SUP based on the *2021* application.  This case is not "within the same pending case" as our previous holding concerning the 2017 application.  We also reiterate the significant differences discussed herein between these two applications and the facts concerning each.  The law of the case does not apply.

None of Appellants' asserted doctrines are applicable to bar the proposed special use.  Accordingly, Point II is denied.

## Conclusion

For the foregoing reasons, the judgment is affirmed.

_____
W. DOUGLAS THOMSON, JUDGE

All concur.